**In re DEBORAH M. and James M.**

**No. 87–413–Appeal.**

Supreme Court of Rhode Island.

July 6, 1988.

Mary Lisi, Guardian Ad Litem, Kevin J. Aucoin, Dept. of Children and their Families, Francis B. Brown (Court-Appointed Sp. Advocate Unit), for plaintiff.

Burton Salk, Warwick, Lidia Sanchez, Scott A. Lutes, Cooper, Harris & Sanchez, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This child-custody matter presents evidentiary questions concerning the admissibility of statements made by young children to State social workers and the admissibility of a tape recording that evinces parental neglect and abuse. The appellant, whom we shall call Mrs. M., contends that such evidence is inadmissible hearsay that should have been excluded from the Family Court proceedings in which she lost custody of her children, Deborah M. and James M. The appellee, the Department for Children and Their Families (DCF), argues that the evidence is admissible under statutory and common law exceptions to the hearsay rule. Before we resolve this dispute, we shall review the pertinent facts that were adduced at trial.

On the evening of March 24, 1986, the Warwick police received a telephone call reporting a disturbance at Mrs. M.'s home. The caller, who identified herself as a friend of Mrs. M., also indicated that the man with whom Mrs. M. was arguing, whom we shall call Alex, might be armed.

When the police arrived at the home, they found it occupied by Mrs. M.; her two children Deborah, aged seven years, and James, aged two years; Mrs. M.'s boyfriend, Alex; and their infant child, Alex, Jr.

The police interviewed Mrs. M., who told them her boyfriend kept guns in their home. She then gave the officers permission to go upstairs and take. any firearms that they found. A policeman proceeded to the next floor of the dwelling where he located a broken gun cabinet that contained a cassette player. He turned the recording device on and heard what sounded like a conversation between a man and a young girl. The conversation included apparent sexual references, prompting the police to transport Mrs. M. and Alex to headquarters for further questioning. At that time Mrs. M. identified the tape recorder and the male voice as belonging to Alex and the female voice as that of her daughter, Deborah. The Warwick police then notified DCF of the investigation.

Later that night a child protective investigator from DCF, David Russo, went to the Warwick police station where he questioned Mrs. M. and Alex about the tape recording. Alex told Russo that he made the tape "to protect himself." Following this conversation, Russo proceeded to Mrs. M.'s home where he interviewed Deborah.

Deborah initially denied that Alex had touched her or that he had recorded the two of them on tape. Later in the discussion, however, Deborah admitted that she and Alex had made a cassette recording. The following day Russo took the girl and her two-year-old brother to Rhode Island Hospital for physical examinations and further questioning.

Deborah was interviewed at the hospital by Candace Salvo, Russo's supervisor at DCF and a former case worker who had counseled Deborah for several years. Deborah greeted Salvo with an embrace, and in the privacy of an examination room the two of them began discussing the girl's situation at home. Deborah told Salvo that Alex had touched her as recently as the preceding Friday, March 21, and that he had on other occasions punched and kicked her younger brother, James. With the aid of anatomically correct dolls supplied by Salvo, Deborah illustrated how Alex had rubbed her genital area. The girl later repeated this demonstration for Russo, explaining that she had earlier deceived him about the sexual touching because she was afraid of Alex and because her mother had told her to lie to DCF workers.

James, who has severe heart, speech, and vision problems, was also interviewed at the hospital. Because of the boy's condition and youth, Russo asked him a series of simple questions requiring only yes or no answers. James indicated that Alex had beaten him, and he said he wanted to stay with his mother but not with Alex.

As a result of this investigation Deborah and James were removed from Mrs. M.'s household and placed in the protective custody of DCF. Mrs. M. acknowledged that this was not the first custody dispute involving abuse of her children. Two years earlier, in November 1984, approximately six months before Alex moved into her home, she lost custody of Deborah's two older siblings after one of them accused Alex of beating him and burning his hands. Mrs. M. also testified that Deborah had temporarily been taken from her custody when they lived with Mr. M. and that Deborah and James had been removed for approximately one month shortly after Mr. and Mrs. M. separated.

Mrs. M. asserted that Alex had a good relationship with her children. She stated that she planned to marry him and to continue to live with him. She added, however, that "if they proved [Alex] was abusing the children, I would kick him out."

Mrs. M. denied that Deborah had told her about Alex's touching her in a sexual manner. She testified that her daughter had a severe dry-skin condition, "especially between her legs on the inside," that required the twice-daily application of lotion. She stated that either she or Alex rubbed the child with this medication.

Mr. M., who took custody of Deborah shortly after the DCF investigation began in March of 1986, testified that his daugh-

ter had recuperated from her dry-skin condition by the time she came to stay with him. He also stated that although he would gladly accept custody of James as well as Deborah, he would need special assistance with his son because of the boy's medical problems.

After reviewing the evidence presented, the trial justice found that Deborah and James were neglected and abused by their mother. In his decision the Family Court justice placed great weight on Deborah's statements to Russo and Salvo concerning Alex's abusive behavior. The trial justice also considered the tape recording in reaching his conclusion that an act of sexual molestation had been perpetrated by Alex against Deborah. In addition, the justice stated that the mother's insistence on living with Alex left him no choice but to find that continued placement of the children in Mrs. M.'s home was contrary to their best interests.

In a decree entered February 10, 1987, custody of Deborah was granted to the father and legal supervision was granted to DCF. Custody of James was granted temporarily to DCF with instructions to place the boy with his father within one month's time. The mother was granted supervised visitation with the two children.

On appeal Mrs. M. contends that the Family Court justice erred by admitting into evidence the statements made by the children to the DCF workers. She also argues that the justice erred by admitting the tape recording into evidence. We shall first address the children's statements that were admitted under G.L. 1956 (1981 Reenactment) § 14–1–69, as enacted by P.L. 1985, ch. 381, § 1,[1] a statutory exception to the hearsay rule that applies to disputes involving custody and/or termination of parental rights.

Mrs. M. contests the applicability of § 14–1–69 to the hearsay statements at issue. She argues that the children's incriminating remarks about Alex were not made spontaneously or within a reasonable time after the alleged incidents of abuse. The mother asserts that the children's responses were the products of questioning by DCF and that the inculpatory information was elicited four days after the alleged occurrence of abuse. These out-of-court statements, according to Mrs. M., therefore do not satisfy the criteria for reliability required under § 14–1–69.

The mother's arguments fail to recognize that relaxed standards of spontaneity and timeliness apply to hearsay proffered under § 14–1–69. This statute liberalized the common law test for admission of children's out-of-court statements concerning their physical abuse. The Legislature eliminated the requirement that the declarant must have been "laboring under the stress of nervous excitement" when the statement was made. *State v. Creighton*, 462 A.2d 980, 982 (R.I. 1983). To ensure reliability, the lawmakers instead required that the hearsay statement must have been "made to someone the child would normally turn to for sympathy, protection, or advice." *See In re Thomas V.*, 540 A.2d 1027 (R.I. 1988) (two-year-old's statement to physician concerning sexual abuse found admissible).

Although the 1985 enactment of § 14–1–69 modified the spontaneous-utterance doctrine as it applies to victims of child abuse, our treatment of spontaneity in earlier cases involving the hearsay statements of children remains instructive. In *State v. Nordstrom*, 104 R.I. 471, 476, 244 A.2d 837, 840 (1968), we determined that "the test to be applied is whether from the facts of a particular case the statements

---

1. General Laws 1956 (1981 Reenactment) § 14–1–69, as enacted by P.L. 1985, ch. 381, § 1 provides:

   "In any custody and/or termination trial where a petition has been filed by the department for children and their families in accordance with §§ 14–1–11, 40–11–7 and/or 15–7–7 in the family court, the court may, in its discretion, permit as evidence any statement by a child under the age of thirteen (13) years old about a prescribed act of abuse, neglect or misconduct by a parent or guardian, if such statement was made spontaneously within a reasonable time after the act is alleged to have occurred, and if the statement was made to someone the child would normally turn to for sympathy, protection or advice."

were spontaneous or impulsive or whether they were the product of reflection and deliberation." And in *Creighton*, 462 A.2d at 982, we noted that spontaneous statements need not be initiated by the declarant. Even responses to an inquiry can properly be characterized as spontaneous.

In this dispute, DCF investigator Salvo testified that she had worked with Deborah for approximately five years during which she created a close relationship. This familiarity clearly established Salvo as someone the child would normally turn to for sympathy, protection, or advice, and it qualified the social worker to testify at trial about Deborah's out-of-court statements. Although the statements of James are not so secure in this regard, the trial justice stated that he placed little weight on the boy's responses.

Salvo testified that Deborah, when presented with the anatomically correct dolls, took the female model, removed its clothes, and used it to demonstrate the sexual manner in which she was rubbed by Alex. This was Deborah's first opportunity to express herself without fear of reprisal from her mother or Alex, and nothing in the record indicates that her revelation to Salvo was premeditated or induced. In determining that the girl's behavior and subsequent explanation represented a spontaneous statement, the trial justice was certainly acting within the broad discretionary powers granted him in evidentiary matters of this nature. *Creighton*, 462 A.2d at 982.

The trial justice was also acting within his sound discretion when he determined that Deborah's statement on March 25 was not too remote in time from the March 21 incident of abuse. "Generally speaking, a less demanding time requirement is necessary in sexual-offense cases, particularly when the victim is a child of tender years." *Creighton*, 462 A.2d at 982. We reject any approach to this issue that calls for blind obedience to the clock and an hour-by-hour count of the time that has passed between the event and the declaration. *State v. Nordstrom*, 104 R.I. at 476, 244 A.2d at 840.

Here Deborah stated that she told her mother about the assaults by Alex. Deborah also reported that Mrs. M. responded with indifference and instructed her not to disclose Alex's wrongdoing to DCF. In view of these circumstances, Deborah's meeting at the hospital with Salvo may have been her first chance to discuss her domestic troubles truthfully. Therefore, in light of the facts presented, the passing of four days between the date of the assault and its disclosure represents a reasonable interval. The trial justice's ruling on this matter shall remain undisturbed.

■ The trial justice's decision to admit into evidence the tape recording shall also be affirmed. We have determined that "sound recordings, if related to otherwise competent evidence, are admissible provid[ed] a proper foundation is laid for their admission." *State v. Gonya*, 107 R.I. 594, 596, 268 A.2d 729, 730 (1970). Although Mrs. M. challenges the authentication of the recording and its chain of custody, we find that these foundational requirements were met.

Mrs. M. identified the gun cabinet from which the cassette was seized as belonging to Alex. When the tape was later played at the Warwick police station, both Mrs. M. and Alex acknowledged that the recorder was his. Mrs. M. then identified the voices on the tape, and Alex admitted that he had made the recording.

Subsequently, at trial, Mrs. M. again identified the tape recorder as Alex's and acknowledged that the cassette offered into evidence was the same recording of Alex and Deborah that she had heard at police headquarters. In addition Deborah's statement to Russo corroborated her mother's identification of the tape. In view of the foregoing, we find no fault in the determination by the trial justice that the tape recording was authenticated.

A sufficient chain of custody was also established at trial. The Warwick police records indicate that officers confiscated the tape recorder and cassette from the gun cabinet at Mrs. M.'s home and then brought the items to their station. Officer James Cousineau, records custodian at the

Warwick police department, testified that he received the tape recording from the Warwick Bureau of Criminal Investigation. There is no evidence in the record to suggest that the tape ever left the custody of the Warwick police or that it was altered in any way. As we held in *State v. Cohen*, 538 A.2d 151 (R.I. 1988), a chain of custody for physical evidence is established by showing a "reasonable probability that no one has tampered with the exhibit." *Id.* at 154 (quoting *State v. Infantolino*, 116 R.I. 303, 312, 355 A.2d 722, 727 (1976)). Absent indicia of tampering, an incomplete chain of custody only affects the weight of the evidence, not its admissibility. 538 A.2d at 154.

Mrs. M. also contends that the Family Court justice erroneously admitted the recording into evidence as a declaration against interest. The mother claims that the tape does not satisfy the requirements of this exception to the hearsay rule. She argues that Alex, who was living with her at the time of trial, was not an unavailable declarant and that the tape recording does not constitute a statement against his penal interests.

A review of the record indicates that DCF tried to summons Alex to testify on at least two occasions. He successfully avoided the attempts of the process servers, and he refused to comply with Mrs. M.'s request that he appear at trial. In fact, Mrs. M. stated, "I asked him if he would come and testify, and he said, why should he come in and get blamed for something he did not do."

The trial justice determined that DCF had exercised due diligence in notifying Alex of the Family Court proceedings. He also decided that Alex's refusal to testify rendered him an unavailable declarant. Furthermore the trial justice found that the tape recording revealed an act of molestation. Consequently the contents of the recording constituted an admissible statement against Alex's penal interests. *See State v. Lerner*, 112 R.I. 62, 83, 308 A.2d 324, 338 (1973). Our review of the trial rescript and the transcript of the tape recording indicates that these findings are

not clearly wrong, *Raheb v. Lemenski*, 115 R.I. 576, 579, 350 A.2d 397, 399 (1976), and that the evidence was properly admitted. *See* R.I. Rules of Evidence 804(b)(3), enacted October 1, 1987, after this case came on for trial.

For the foregoing reasons the appeal of Mrs. M. is denied and dismissed, and the decree of the Family Court is affirmed.