In re ALEXIS L.

No. 2006–57–Appeal.

Supreme Court of Rhode Island.

June 12, 2009.

---

Matthew J. McGovern, Court Appointed Special Advocate.

Thomas Corrigan, Jr., Department of Children, Youth & Families.

Paula Rosin, Office of the Public Defender.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (Ret.).

## OPINION

Justice SUTTELL, for the Court.

This appeal is the last of a triumvirate of cases arising from the horrific abuse inflicted upon Alexis L.[1] by his father and his mother's inability or unwillingness to protect him. *See State v. Lopez–Navor*, 951 A.2d 508 (R.I.2008) and *In re Victoria L.*, 950 A.2d 1168 (R.I.2008). This case came before the Supreme Court on appeal by the respondent, Rosalia Lopez–Navor (Lopez–Navor or respondent), from a decree entered in the Family Court terminating her parental rights to Alexis. For the reasons set forth in this opinion, we affirm the decree of the Family Court.

## I

### Facts and Procedural History

Lopez–Navor met Alexis's father, Raul DeRosas (DeRosas) in Mexico when she was fifteen years old and he was approximately twenty-two. In January 2001, DeRosas illegally entered the United States, leaving a pregnant Lopez–Navor in Mexico. The respondent gave birth to Alexis on August 17, 2001, in Chalco, Mexico. Two years later, in August 2003, Lopez–Navor came to the United States, also illegally, arriving with Alexis in Providence to reunite with DeRosas. DeRosas paid for their entrance into and transportation across the United States from Mexico. At the time, Lopez–Navor was eighteen years

---

1. The child's name appears variously in the record as Alexis, Yahir, Yahir Alejandro, and Alejandro. The termination petition lists his name as "Yahir (AKA Alexis)," yet the termination decree is captioned "Alexis AKA Yahir Alejandro L." Because the child is most commonly referred to in the record as Alexis (indeed we identified him as Alexis in the two opinions we issued last term involving this family), we shall refer to him as Alexis. *See State v. Lopez–Navor*, 951 A.2d 508 (R.I.2008) and *In re Victoria L.*, 950 A.2d 1168 (R.I. 2008).

old and Alexis was two. The respondent testified that she came to the United States "with the dream of having a family."

After living in Rhode Island for about two months, on October 29, 2003, Lopez–Navor was hospitalized for a kidney infection at Women & Infants Hospital. At the time, respondent was pregnant with her and DeRosas' second child. The next day, when Raul brought Alexis to the hospital to visit respondent, a certified nursing assistant observed bruising on the child's face and notified a clinical social worker employed by the hospital. DeRosas and Lopez–Navor said that Alexis had incurred the injuries by falling outside the hospital the day before and in the bathtub a few days earlier. A pediatrician was summoned, who examined the child and found additional injuries on his body. Alexis then was taken to Hasbro Children's Hospital, where an examination revealed significant bruising and redness on his face, a handprint on one cheek, cuts on his gums and inner lips, abrasions on and around his ears, multiple bruises on his legs, bite marks on his buttocks and upper thighs, ligature marks on both ankles, and a laceration on his penis.[2] As a result, Alexis was admitted to the hospital and placed in the temporary custody of the Department of Children, Youth and Families (DCYF).

After an abuse investigation by DCYF, both Lopez–Navor and DeRosas were "indicated" for the physical abuse to their son.[3] After a police investigation, DeRosas was criminally charged with second-degree child abuse under G.L. 1956 § 11–9–5.3, and Lopez–Navor was criminally charged with cruelty to or neglect of the child under § 11–9–5 for failing to protect him. The police and DCYF investigations also revealed that DeRosas and Lopez–Navor were in the United States illegally, which led the United States Department of Immigration and Naturalization Services to place a "hold" on them. DeRosas was detained and later deported to Mexico on February 12, 2004. The respondent was detained from November 14, 2003 to December 23, 2003, when she was released on personal recognizance.

After she was discharged from the hospital around November 4, 2003, respondent initially told Det. Nancy Santo Padre Dos-Reis of the Providence Police Department, at a station interview, that she saw DeRosas spank their son on a single occasion. She did not indicate any concern about leaving her son in the care of his father and stated that she was not afraid of him. In February 2004, however, Lopez–Navor agreed to provide another police statement, in which "she admitted that Raul [DeRosas] habitually abused Alexis by hitting him, biting him, and restraining him," including placing him in a box in the dark with elastic bands around his ankles. *Lopez–Navor*, 951 A.2d at 510. The respondent told police that when she tried to intervene, DeRosas "ordered her to stay away and said that he would abuse her son even more if she did not." *Id.* She testified at trial that she failed to tell the truth

2. Various witnesses testified to the injuries they observed on Alexis, including the certified nursing assistant and social worker employed by Women & Infants Hospital, two nurses employed by Hasbro Children's Hospital, a child protective investigator assigned to Alexis's case by the Department of Children, Youth and Families (DCYF), a Providence po-lice detective assigned to investigate child abuse allegations, and Alexis's foster mother.

3. "Child Protective Investigators 'indicate' a case if, upon completion of an investigation, a preponderance of the evidence demonstrates to them that a child has been abused or neglected." *In re Brooklyn M.*, 933 A.2d 1113, 1115 n. 1 (R.I.2007).

originally because she was afraid that De-Rosas would continue to harm Alexis.[4] *Id.*

Maria Garrido, Ph.D., a psychologist who evaluated respondent at the request of DCYF, testified that respondent "reluctantly acknowledged" that DeRosas had abused Alexis but had difficulty discussing the details or extent of the abuse; respondent would not share the specific ways DeRosas was hurting the child. According to Dr. Garrido, respondent spoke little about her attempts to intervene when the abuse was occurring. The respondent told Dr. Garrido that the "most active" attempt she made to end the abuse was to leave the home at one point. This proved unsuccessful, she told Dr. Garrido, when she became lost and did not know where to go for help, so she returned. When asked about Lopez–Navor's ability to parent her son, Dr. Garrido stated:

> "I failed to find a reason to consider [Lopez–Navor] herself to be a risk to her child. * * * My most important concern, however, in this situation, however [*sic*], has been her apparent inability to be more proactive or more active in protecting her child against this partner. Nevertheless, it appears there was a significant level of fear and intimidation along with the fact she was—what she reported—unfamiliar with her immediate environment and resources that would have assisted her. So that was what I consider to be a very negative combination of circumstances operating against her and her ability to actively seek resources or to protect her child."

Doctor Garrido also stated that respondent seemed intimidated by DeRosas but claimed to have been subject to only verbal, not physical, abuse.

Rita Graterol was the DCYF social worker assigned to this case. It was her role to facilitate supervised visitation between Alexis and Lopez–Navor, as well as to devise a case plan with a goal of reunification. Three supervised visits occurred between the date of Alexis's hospitalization and the start of trial. At the first visit, which took place on November 12, 2003, Alexis was reluctant to let go of his foster mother, crying when she left. Alexis did not make eye contact with respondent for about fifteen minutes, even as she was hugging and talking to him, although they eventually began interacting with each other. According to Ms. Graterol, Alexis did not cry when the visit ended. At a second visit on January 21, 2004,[5] Alexis interacted with his mother and did not cry at the conclusion of the visit. At a third visit, on February 3, 2004, Ms. Graterol testified that respondent attempted to give Alexis a stuffed animal, but Alexis at first refused to accept it from her. When he finally took it, he threw it to a corner of the room. The visit lasted only forty minutes because Alexis asked to leave. After that visit, a no-contact order was issued, due to the criminal charges pending against Lopez–Navor, preventing her from contacting her son.[6]

---

4. Lopez–Navor testified that she did not initially disclose the abuse that DeRosas had inflicted on her son because she did not know her child had been taken to Hasbro Children's Hospital and thought that Alexis was still in his care. However, she testified earlier that she was not concerned about the child being alone with his father because a nurse at Women & Infants Hospital informed her the child was in the emergency room at Hasbro Children's Hospital and did not go home with his father.

5. Two months passed between visits because of respondent's temporary detention by immigration authorities.

6. Although both Dr. Garrido and Ms. Graterol testified that Lopez–Navor was always cooperative in complying with the DCYF case

Alexis's foster mother, Yolanda, also testified at trial. Yolanda and her husband had been caring for Alexis since Hasbro Children's Hospital discharged him on November 4, 2003. She testified that Alexis would not sleep when he first started to live with them and "would just cry." She stated that he would call for her during the night, saying "no solo," meaning that he did not want to be left alone. In addition, Yolanda said that the child did not urinate for three days when he first came to live with them. He eventually wet himself on the fourth day. He also exhibited some unusual sexual behaviors at first, and she had problems with him hitting and punching her. She stated that he is now able to sleep through the night, and she has sought a consultation about the child's aggressive behavior. Yolanda testified that she has a good relationship with Alexis and is considering adoption; she stated that her husband desires to adopt the child, if possible. Ms. Graterol, the DCYF caseworker, testified that she had observed Alexis in his foster home on numerous occasions and there appeared to be a "very close" relationship between the child and his foster parents. She indicated that the foster parents' home is pre-adoptive in nature.

DCYF filed in the Family Court both a child-neglect/abuse petition and a petition for an involuntary termination of parental rights.[7] The petitions were consolidated for purposes of trial, which commenced on March 30, 2004. On June 16, 2004, after the presentation of evidence but before the trial justice reached a decision, Lopez–

Navor gave birth to a daughter, Victoria, who was taken into DCYF custody because of the allegations of abuse to Alexis.[8]

The trial justice issued a bench decision on October 13, 2004, making numerous factual findings regarding the evidence in this case. He found the nurses, the detective, the child protective investigator, the social worker and the foster mother to be credible witnesses; however, he concluded that Lopez–Navor was not a credible witness. The trial justice concluded that the evidence of abuse to Alexis was clear and that respondent was aware that the child's father was inflicting injury on the child. He noted that Lopez–Navor lived in a Spanish-speaking community, was not physically restrained from leaving the apartment, and had been out of the apartment a number of times. The trial justice also pointed out that respondent did not tell police, hospital staff, or DCYF workers that she had been harmed or was in fear of DeRosas. The Family Court concluded that there was no evidence that Lopez–Navor herself had been physically or psychologically abused over an extended period of time; thus, he rejected respondent's assertion that she suffered from battered women's syndrome. The trial justice found clear and convincing evidence that:

"[T]he mother is unfit by reason of conduct or conditions seriously detrimental to the child, Alexis[,] in that the mother has committed or allowed to be committed, conduct towards Alexis of a cruel or abusive nature. The mother Rosalia Lopez[-Navor] failed to provide a safe and secure home where Alexis could live in a

---

plan, its terms and conditions were not satisfied for two reasons: Required parenting classes were not offered in Spanish and the no-contact order prevented Dr. Garrido from observing the interaction between mother and child. Ms. Graterol testified that she was unaware of any interaction between respondent and Alexis since the no-contact order was entered in February 2004.

7. We note that after DCFY files a termination petition alleging parental conduct of a cruel and abusive nature, it no longer has a statutory obligation "to engage in reasonable efforts to preserve and reunify [the] family." G.L. 1956 § 15–7–7(b)(1).

8. According to DCYF, it placed Victoria in the same foster home as Alexis.

nurturing environment free from physical abuse."

The termination of respondent's parental rights was found by the trial justice to be in Alexis's best interests. The Family Court entered a decree terminating Lopez–Navor's parental rights on October 22, 2004.[9] The respondent timely filed a notice of appeal.[10]

We discuss additional facts in the context of the issues raised on appeal.

## II

### Standard of Review

■■■ "On review of cases involving the termination of parental rights, this Court must examine the record to determine if legally competent evidence exists to support the trial justice's findings." *In re Corryn B.*, 914 A.2d 978, 981 (R.I.2007) (quoting *In re Amber P.*, 877 A.2d 608, 617 (R.I.2005)). The findings of the trial justice "are entitled to great weight, and this Court will not disturb them on appeal unless the findings are clearly wrong or the trial justice misconceived or overlooked material evidence." *In re David L.*, 877 A.2d 667, 671 (R.I.2005) (quoting *In re Shawn B.*, 864 A.2d 621, 623 (R.I.2005)).

■■■ "Natural parents have a fundamental liberty interest in the 'care, custody, and management' of their children." *In re Destiny D.*, 922 A.2d 168, 172 (R.I. 2007) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). In order to permanently sever the rights of a parent in his or her children, the trial justice must make a determination that the parent is unfit. *In re Nicole B.*, 703 A.2d 612, 617 (R.I.1997); *see In re Destiny D.*, 922 A.2d at 172. The state must prove parental unfitness by clear and convincing evidence in order to satisfy the parent's right to due process. *In re Destiny D.*, 922 A.2d at 172; *see also In re Antonio G.*, 657 A.2d 1052, 1057 (R.I.1995) (citing *In re Kristina L.*, 520 A.2d 574, 580 (R.I.1987) ("A finding of unfitness, therefore, is 'the first necessary step' before any termination of parental rights can be initiated.")). After the trial justice finds that the parent is unfit, "the best interests of the child outweigh all other considerations." *In re Destiny D.*, 922 A.2d at 173 (quoting *In re Kristen B.*, 558 A.2d 200, 203 (R.I.1989)). "[T]he best interests of the child encompasses 'the right of a minor child to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive.'" *In re Alivia K.*, 909 A.2d 498, 505 (R.I.2006) (quoting *In re Mariah M.*, 899 A.2d 423, 427 (R.I.2006)).

## III

### Discussion

The respondent has presented three issues for our review. First, she contends

---

**9.** The Family Court terminated DeRosas's parental rights to Alexis at a hearing on October 14, 2004.

**10.** One month later, DCYF filed a petition to terminate DeRosas's and Lopez–Navor's parental rights to their daughter, Victoria, based on abandonment of the child by the father and unfitness of the parents. On March 16, 2005, while that termination proceeding was pending, Lopez–Navor was criminally convicted of cruelty to and neglect of Alexis and sentenced to eighteen months probation and counseling. Subsequently, the Family Court terminated respondent's and DeRosas's parental rights to Victoria. Last term, this Court affirmed her criminal conviction and the decree of the Family Court terminating her parental rights to her daughter. *See Lopez–Navor*, 951 A.2d 508 and *In re Victoria L.*, 950 A.2d 1168. Before those cases reached this Court, Lopez–Navor had been deported. She had testified at trial that she desired to return to Mexico, albeit with her children.

that the trial justice impermissibly allowed Alexis's foster mother to testify to hearsay statements that the child allegedly made three months after being placed in her care. Second, respondent argues that the trial justice abused his discretion in not permitting expert testimony about whether the respondent-mother was the victim of domestic violence. Finally, she maintains that the trial justice erred in determining that it was in Alexis's best interests to terminate his mother's parental rights.

## A

### Statement Made by the Child to Foster Mother

■ At the termination trial in Family Court, Alexis's foster mother, Yolanda, testified that in February 2004, as she was dressing him, he was not cooperating and she asked him what was wrong. Alexis answered "other mum bad baby pao pao."[11] As he said this, he was hitting himself in the face, Yolanda stated. Counsel for respondent objected and moved to strike. Both DCYF and Alexis's guardian ad litem argued that the child's purported statements to his foster mother were admissible under G.L. 1956 § 14-1-69. Although the trial justice stated he would take the objection under advisement, immediately thereafter he permitted the foster mother to reiterate the child's statements, again over an objection. Notably, Alexis made similar statements to nurses at the hospital in November 2003–statements that had been admitted into evidence earlier at trial.

Section 14-1-69 is "a statutory exception to the hearsay rule that applies to disputes involving custody and/or termination of parental rights." *In re Deborah M.*, 544

A.2d 572, 574 (R.I.1988). Section 14-1-69 provides as follows:

"In any custody and/or termination trial and/or a hearing on a motion or probable cause hearing where a petition has been filed by the department of children, youth, and families in accordance with §§ 14-1-11, 40-11-7 and/or 15-7-7 in the family court, the court may, in its discretion, permit as evidence any statement by a child under the age of thirteen (13) years old about a prescribed act of abuse, neglect, or misconduct by a parent or guardian, if that statement was made spontaneously within a reasonable time after the act is alleged to have occurred, and if the statement was made to someone the child would normally turn to for sympathy, protection, or advice."

This Court has recognized § 14-1-69 as a statute that liberalized the common law excited-utterance doctrine for admission of out-of-court statements made by children concerning physical abuse. *In re Veronica T.*, 700 A.2d 1366, 1367 (R.I.1997); *In re Deborah M.*, 544 A.2d at 574. The Legislature eliminated the requirement that the child be under the stress of nervous excitement at the time he or she made the statements. *In re Deborah M.*, 544 A.2d at 574; *cf. State v. Oliveira*, 961 A.2d 299, 314-15 (R.I.2008) (broadly construing excited-utterance exception in child molestation cases). Section 14-1-69 ensures reliability, instead, by requiring that the child communicate the statements concerning physical abuse (1) spontaneously, (2) within a reasonable time after the alleged act(s) of abuse occurred, and (3) to a trusted adult. *In re Veronica T.*, 700 A.2d at 1367; *In re Rocco W.*, 706 A.2d 1302, 1303 (R.I.1998). *See also In re Thomas V.*, 540

---

11. Various Spanish-speaking witnesses testified that "pao pao" is Spanish-slang for hitting, slapping or reprimand for misbehavior.

The respondent, however, said she used the term "pao pao" to refer to fruit juice, not discipline.

A.2d 1027, 1027 (R.I.1988) (statements of two-year-old child admissible because § 14–1–69 does not require that the child be competent to testify in order for his or her statements to be admitted into evidence). We recognize that the timeliness of statements at issue may be reflective of their spontaneity. Our treatment of spontaneity in cases decided before adoption of § 14–1–69 involving the hearsay statements of children remains instructive. *In re Deborah M.*, 544 A.2d at 574; *see, e.g., State v. Creighton,* 462 A.2d 980, 982 (R.I. 1983) (spontaneous statements need not be initiated by the declarant; even responses to inquiries can be properly characterized as spontaneous); *State v. Nordstrom,* 104 R.I. 471, 476, 244 A.2d 837, 840 (1968) ("the test to be applied is whether from the facts of a particular case the statements were spontaneous or impulsive or whether they were the product of reflection and deliberation"). On review, we note, "a trial justice has broad, discretionary powers in evidentiary matters of this nature, and the trial justice's decision will be reversed only if that discretion has been abused." *In re Jessica C.*, 690 A.2d 1357, 1360 (R.I.1997). The respondent contends that the three-month passage of time that Alexis was in his foster mother's care before making these statements was unreasonably removed from the alleged acts of physical abuse,[12] and the trial justice should have precluded his statements.

This Court has declined to set specific parameters regarding the timeliness and spontaneity of statements under § 14–1–69. *See In re Rocco W.*, 706 A.2d at 1304. However, "there are still limits to allowing such hearsay statements by children into evidence." Id at 1303–04. We have held that "significant lapses of time, ample opportunity for reflection and deliberation, and numerous previous disclosures" of abuse suggest that the statements had not been made spontaneously or at the child's first opportunity to safely disclose the abuse. *In re Jessica C.*, 690 A.2d at 1361.

In terms of timeliness, we have held that the passing of a few days or weeks between a child's disclosure of abuse and the date that the alleged abuse occurred, or the date when the child was removed from the scene of the abuse, constitutes a reasonable time lapse for purposes of § 14–1–69. For instance, in *In re Veronica T.,* 700 A.2d at 1367–68, we held that a child's out-of-court statements made about two weeks after the alleged abuse occurred satisfied the timeliness requirement of § 14–1–69. *See also In re Jean Marie W.,* 559 A.2d 625, 631 (R.I.1989) (statements made within three days after a child's placement in foster care were made within a reasonable interval from the time she was removed from the scene of her abuse); *In re Deborah M.,* 544 A.2d at 575 ("the passing of four days between the date of the assault and its disclosure represents a reasonable interval" under § 14–1–69). We have held unreasonable, however, the passing of several months between the acts of alleged abuse and a child's disclosure. For example, we opined that the limits of § 14–1–69 were exceeded in *In re Jessica C.,* 690 A.2d at 1360–61, when the children's hearsay statements were made between two and twelve months after the children either had been removed from the scene of the alleged abuse or had made initial allegations. *See also In re Rocco W.,* 706 A.2d at 1304 (hearsay statements made about six months after the child was removed from the home where the abuses occurred "were not made spontaneously within a reasonable time after the alleged abuse occurred"). As these cases demonstrate,

12. There is no dispute that Alexis made the statements at issue to a trusted adult.

we consistently have declined to delineate any precise temporal limitations.

In light of the circumstances of this case, we conclude that Alexis's statement to his foster mother was not made within a reasonable time after the alleged abuse. Here, Alexis had been living with his foster mother for a significant amount of time, over three months, at the time the statement was made, and the testimony at trial indicated they had formed a close bond long before. Moreover, Alexis had made virtually identical statements closer in time to when he was removed from his parent's custody.[13] We are satisfied, therefore, that the trial justice abused his discretion by allowing its admission.

■ Nevertheless, we are of the opinion that admission of this hearsay testimony, even though erroneous, does not demand a reversal of the trial justice's decision to terminate the parental rights of respondent. *See In re Jessica C.*, 690 A.2d at 1361. The trial justice based his decision *not* upon abuse allegedly inflicted on Alexis *by respondent* but rather upon her failure to protect her son from his father's abuse, of which she admittedly was aware.[14] The trial justice determined that Lopez–Navor "failed to come to [Alexis's] aid when a reasonable mother would have been expected to protect him in one way or another" and had failed to provide a safe and secure home for him. It is the law in this jurisdiction that a parent who ignores or stands by while child abuse or neglect occurs is tantamount to the parent inflicting the abuse him/herself for purposes of a termination proceeding. *In re Chester J.*, 754 A.2d 772, 778 (R.I.2000) (interpreting G.L. 1956 § 15–7–7(a)(2)). Accordingly, the trial justice found that "the mother's failure to act on behalf of Alexis is evidence of conduct of such a nature [as] to rise to the level of cruel or abusive." The erroneously admitted hearsay statement had little, if any, weight in the trial justice's decision-making and, thus, does not warrant reversal.

## B

### Qualification of Witness to Testify as an Expert

■ By the time Lopez–Navor testified at trial, in the spring of 2004, she was living, with the help of the Mexican Consulate in Massachusetts, at the Women's Center of Rhode Island, a shelter for victims of domestic violence.[15] At trial, respondent called Donna DeLeon, a full-time residential advocate employed by the shelter, to testify. Ms. DeLeon came to know Lopez–Navor because she had performed her intake on the first day Lopez–Navor came to live at the shelter, and she led a group session every Wednesday that Lopez–Navor attended. Ms. DeLeon testified that she had been a paid staff member at the Center for twelve years, after having volunteered as a Spanish interpreter.

13. Marlene Reidl, a registered nurse employed by Hasbro Children's Hospital, testified that on November 1, 2003, Alexis said, when asked who had hit him, "mommy, poppy" and then he slapped his mouth and his face with his hand. Dana Poloski, a registered nurse and assistant clinical manager at Hasbro, testified that she was also in the room with Ms. Reidl and Alexis. She recalled Alexis saying "mommy and poppy pao pao" once or twice, after which he proceeded to hit himself in the face and mouth. She also testified he started to hit a stuffed animal in the face and mouth, shaking it and acting "aggressive toward it."

14. The trial justice made 127 specific findings of fact, none of which refers to Alexis's statement indicating abuse by his mother.

15. The Women's Center of Rhode Island does not question a woman's representation that she is a victim of domestic violence; no separate determination is made.

She had an associate's degree in social science from the Community College of Rhode Island. Over the last twelve years, she said she had gained experience both by attending many training programs in domestic violence and by experience through her work with victims.

When counsel for respondent asked Ms. DeLeon to explain whether Lopez–Navor's demeanor and behavior was characteristic of a domestic-violence victim, the Family Court sustained an objection by the guardian ad litem, ruling that Ms. DeLeon would be permitted to testify only to what she observed. The guardian ad litem objected again, shortly thereafter, when respondent's counsel asked the witness if she had an opinion about whether Lopez–Navor was the victim of domestic violence. The court again sustained the objection, refusing to qualify Ms. DeLeon as an expert.

The respondent argues on appeal that Ms. DeLeon had sufficient training and experience upon which to base an opinion and that the trial justice erred by refusing to accept her as an expert witness. We consistently have held that "[t]he question of whether a witness is qualified to express an expert opinion is a matter that is committed to the sound discretion of the trial justice," and this Court will not disturb the exercise of that discretion "absent a showing of abuse." *In re Victoria L.*, 950 A.2d at 1176 (quoting *Narragansett Electric Co. v. Carbone*, 898 A.2d 87, 95 (R.I.2006)).

Rule 702 of the Rhode Island Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion." "The disjunctive conjunction [in Rule 702], which we must assume the drafters of the rule chose deliberately,

suggests that an expert may be qualified on any of the five bases listed." *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir.1990) (interpreting Federal Rule of Evidence 702), *overruled on other grounds, Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075–76 (5th Cir. 1994). Furthermore, a proffered expert's qualifications need not be exceptionally remarkable. *See State v. Arroyo*, 844 A.2d 163, 168 (R.I.2004) ("somewhat limited" qualifications adequate); *New England Telephone and Telegraph Co. v. Clark*, 624 A.2d 298, 303 (R.I.1993) (qualifications "need not be superlative or extraordinary"). Rhode Island law and practice concerning expert testimony "makes helpfulness to the trier of fact the crucial issue." Rule 702, Advisory Committee's Note.

We cannot say that the trial justice, an experienced Family Court justice, abused his discretion in determining that Ms. DeLeon's opinion testimony would not be of assistance to him as the trier of fact. The testimony elicited at trial provided only a brief sketch of her credentials and experience. The record does not reveal what type of social science degree she attained, in which area of study she concentrated, or whether any of her courses related to domestic violence. Nor is it clear from the record whether Ms. DeLeon has any degree, training or experience in psychology, psychiatry or counseling. Although a degree in these specialties is not necessarily required to express an expert opinion about domestic-violence victims, Ms. DeLeon did not testify to the nature of her training courses, nor did she elaborate on the nature of her experience or her specific employment duties. Further, she testified she had never been qualified as an expert witness before. In these circumstances, we cannot say that the trial justice

erred in declining to qualify her as an expert witness.

## C

### Best Interests of the Child

The respondent's final argument is that the Family Court's conclusion that terminating her parental rights would be in Alexis's best interests was not based upon an adequate evidentiary foundation and should be rejected by this Court. The respondent contends that the Family Court's decision did not contain substantive discussion regarding Alexis's best interests, except to note that he had been in a pre-adoptive home since November 2003 and had bonded with his foster parents. Lopez–Navor submits that the trial justice failed to give appropriate weight to the fact that Alexis had been raised for the first two years of his life with his mother in Mexico, that she was only nineteen when she came to the United States, that she was unfamiliar with her environment and the resources available to her, that she fell victim to a cruel and controlling man who intimidated her into silence with threats of hurting Alexis and deportation, and that the events giving rise to the termination petition occurred within a very short period of time.

We are of the opinion that the trial justice properly exercised his prerogative "[f]rom the vantage point of his front-row seat in the courtroom." *In re Victoria L.*, 950 A.2d at 1176. We cannot conclude that the decision of the trial justice was clearly wrong, nor that he misconceived or overlooked material evidence. *See In re David L.*, 877 A.2d at 671. The conclusion that it was in Alexis's best interests to terminate Lopez–Navor's parental rights is supported by legally competent evidence in the record. *See In re Corryn B.*, 914 A.2d at 981.

Although this Court is ever cognizant of the significance of severing the bond be-tween parent and child, it is in the best interests of children to have a safe and nurturing environment in which to live, learn and grow. *See In re Douglas F.*, 840 A.2d 1087, 1089 (R.I.2003); *In re Brianna D.*, 798 A.2d 413, 415 (R.I.2002). The trial justice clearly found that respondent was not able to provide for her son in this way. He made substantial findings that respondent allowed her young son to be repeatedly abused at the hand of her partner without seeking help or medical attention for him. Yet, when she became ill, she was resourceful enough to find a hospital and considered her health important enough to disregard her purported concerns about revealing her illegal-immigration status. The respondent seemed capable of acting in her own best interests, rather than those of Alexis.

The respondent relies heavily on the fact that DCYF did not have the child evaluated by a psychiatrist or psychologist before termination of her rights. However, we never have required that a child be evaluated by a psychiatrist or psychologist before the Family Court may properly terminate parental rights. It was respondent's fitness to safely and effectively parent Alexis that was at issue in this case. We are satisfied that the trial justice made a sound and fully supportable determination of unfitness before he granted the petition.

Furthermore, it was not improper for the Family Court to consider the relationships and bonds that have formed between Alexis and his foster parents. *See In re Shanelly C.*, 785 A.2d 1129, 1132 (R.I.2001) ("We cannot disregard the bond [the child] has formed with loving foster parents in a pre-adoptive home."). It is especially difficult for us to disregard the fact that Alexis has been living with his foster parents, as well as with his biological sister, for five years since the respondent's parental rights were terminated. Alexis, now eight

years old, has had no contact with Lopez–Navor for many years. He now has lived in the United States for most of his life. The evidence presented in this case clearly supports the trial justice's determination relative to the child's best interests.

## IV

### Conclusion

For the reasons outlined in this opinion, we affirm the decree of the Family Court terminating the parental rights of the respondent. The record may be remanded to the Family Court.