October 29, 2020

**Supreme Court**

No. 2017-380-Appeal.
(10-1397-4)

In re Mandy M.                    :

# O P I N I O N

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Mandy M.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.**   The respondent father, Richard Fana,

appeals from a decree that terminated his parental rights to his daughter, Mandy M.

He argues that the decree should be vacated because (1) he was denied the effective

assistance of counsel and (2) the trial justice erred in finding that there was sufficient

evidence to support a finding of parental unfitness.  This case came before the

Supreme Court pursuant to an order directing the parties to appear and show cause

why the issues raised in this appeal should not summarily be decided.  After hearing

the arguments of counsel and after thoroughly reviewing the record, we conclude

that cause has not been shown and that this case may be decided without further

briefing or argument.  For the reasons set forth in this opinion, we affirm the decree

of the Family Court.

# I

# Facts and Travel

Mandy first came to the attention of the Rhode Island Department of Children, Youth, and Families (DCYF or the department) even prior to her birth on October 27, 2014, because both of her parents had been "red-flagged" by DCYF.[1]  Upon return to Rhode Island, Mandy was immediately placed into the care and custody of DCYF.

On February 22, 2016, over four years ago, DCYF filed a petition in Family Court, pursuant to G.L. 1956 § 15-7-7,[2] to terminate respondent's parental rights

---

[1] According to DCYF, to be "red-flagged," one must have a history of prior physical abuse, sexual abuse, or previous involvement with DCYF.

[2] General Laws 1956 § 15-7-7(a) provides, in part:

> "The court shall, upon a petition duly filed by a governmental child placement agency * * * after notice to the parent and a hearing on the petition, terminate any and all legal rights of the parent to the child * * * if the court finds as a fact by clear and convincing evidence that:

> "* * *

> "(3) The child has been placed in the legal custody or care of the department for children, youth, and families for at least twelve (12) months, and the parents were offered or received services to correct the situation which led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]"

with respect to Mandy.[3]  In its petition, DCYF alleged that Mandy had been placed in the legal custody or care of the agency for at least twelve months.  During those twelve months, DCYF alleged, respondent had been "offered or received services to correct the situation which led to the child being placed," and that, because of Mandy's age and need for a permanent home, there was not a substantial probability that she would be able to return safely to respondent's care within a reasonable period of time.

A trial on the petition, which was consolidated with a petition alleging neglect, commenced on October 18, 2016.  At the onset of the trial, respondent's counsel moved to withdraw his appearance.  To support his motion, counsel asserted that he and his client had been unable to come to a meeting of the minds about case strategy.  The respondent said that he did not agree with the advice his attorney had been giving him and that he no longer wished to be represented by him.  The motion was granted by the trial justice, with the understanding that stand-by counsel would be appointed.  The respondent conceded that he understood that he would be proceeding

---

[3] The petition also sought to terminate the parental rights as to mother.  During the proceedings in Family Court, mother signed a direct consent adoption petition with respect to the foster parents.

*pro se*, and that it was "fine[,]" that it could "knock [him] off [his] feet, but [he was] going to take [his] best shot."[4]

The trial justice addressed respondent and indicated that he would ask respondent's counsel to remain as stand-by counsel. However, due to the disagreement in strategy and respondent's inability to pay his legal bills, counsel suggested that the court might appoint another attorney to act as stand-by. The trial justice directed counsel to turn over any discovery materials in his possession to respondent. The trial justice further said that respondent was "going to be pro se in this matter once I get counsel assigned to him for stand-by counsel[,]" adding that it would be an attorney from the court-appointed list. The trial justice then continued the trial to December 1, 2016, so that respondent could read and review the discovery and the court could appoint an attorney as stand-by counsel.

At the next trial date, on December 1, 2016, respondent's stand-by counsel said that he had spoken with respondent and that he indicated that he now wanted a lawyer. The trial justice remarked that respondent had previously "insisted on being pro se" and "didn't even insist on * * * having stand-by counsel[,]" but was now saying that he needed an attorney. The trial justice further explained that he had set the case down for trial on this particular date based upon respondent telling him that

_____

[4] The record indicates that the trial justice may have had an earlier colloquy with respondent about proceeding *pro se* at an earlier hearing date. However, the transcript of that proceeding was not provided to this Court.

- 4 -

he did not require or desire counsel, to which respondent replied, "[s]o, let's go. That's it." Before proceeding further, the trial justice asked both respondent and his stand-by counsel if they were ready to proceed; both indicated that they were.

The trial then commenced. Carlos Rojas, a DCYF caseworker, was the first witness to testify. Mr. Rojas had been assigned to another case involving Mandy's mother before Mandy was born. He testified that Mandy was born on October 27, 2014, in New Jersey, and she was removed from her mother's care because of her mother's serious mental health issues and her previous neglect of her other children. The witness testified that respondent also had a history with DCYF, had been "red-flagged[,]" and "had, at that time, and continues to have, legal issues[.]"

Mr. Rojas said that within the first month, he attempted to develop a case plan for visitation and reunification for respondent, as well as planning for domestic violence treatment and a parent-child evaluation. He said he explained to respondent that the purpose of the case plan was to work together toward respondent's reunification with Mandy, but that at first it was difficult to get input from respondent because "his demeanor wasn't as agreeable[.]"

Mr. Rojas testified that he showed the case plan to respondent and that he "reviewed it with him verbally[.]" He said that he asked respondent to sign the case plan, but that respondent was not willing to sign it. He testified that one of the case plan goals for respondent was domestic violence counseling, but Mr. Rojas did not

refer respondent for domestic violence counseling because respondent took the position that he would not attend. The respondent also was offered a visitation program with Mandy through Families Together visitation, and he agreed to that service. DCYF provided regular visits for respondent, at first together with mother, and, after the issuance of a no contact order which forbade respondent to have contact with Mandy's mother, for respondent separately. However, respondent missed visits from December 2014 through January 2015 because he was incarcerated for violating the no contact order and because of a lack of consistent communication with the caseworker. Mr. Rojas testified that he remained the caseworker until February 13, 2015, when he alerted respondent that there would be a new social worker assigned to the case.[5]

Catherine McCaffrey, the second DCYF social worker who was assigned to respondent's case, testified next. She testified that she supervised visits with respondent and met with him to discuss case plan tasks throughout February and March 2015. She said that she discussed respondent's participation in mental health services at the Providence Center with him and that he reported that he had been attending. She also said that she encouraged him to sign a release for DCYF, so the

---

[5] Mr. Rojas testified that he was reassigned to Mandy's case in February 2016, after the petition for termination of parental rights had been filed, and that he had been the social worker assigned to the case since then.

- 6 -

department would be aware of the services that were being provided to him and of his progress, but that he refused to sign it.

Ms. McCaffrey also testified that she was present when the Families Together visitation program met with respondent and Mandy for an intake appointment. Ms. McCaffrey said that respondent was accepted into the program and that he had been placed on a waiting list. He was contacted to enter the program in May 2015. Ms. McCaffrey testified that she and respondent discussed domestic violence counseling programs and that he said he would go to the Bridgemark Inc. domestic violence program. Ms. McCaffrey explained to respondent that he would need to fund this himself, noting that it was also a requirement of his probation. She also referred respondent for a parent-child evaluation with Family Connections, to which he agreed. However, the parent-child evaluator with Family Connections contacted Ms. McCaffrey on June 4, 2015, and informed her that respondent had refused to participate in the evaluation.

Ms. McCaffrey also testified that at times respondent was late for visits and that at other times he would end the visits early. Although respondent was able to appropriately feed Mandy, at times her fussiness and crying disturbed or angered him, and he would give the task at hand, such as placing Mandy in her car seat, to the caseworker.

During a visit on April 29, 2015, respondent admitted that he and mother had been back together as a couple while the pending no contact order remained in effect, but that they had broken up again. Ms. McCaffrey testified that respondent also told her "that he was present when mother was hitting her other children, and he told her to stop, but didn't take any other actions other than saying, 'stop.'"

DCYF continued to provide weekly visits for respondent until mid-July 2015. Ms. McCaffrey testified that she then learned that respondent had been incarcerated again for violating the no contact order with Mandy's mother. She said that respondent's impatience with reunification, despite his lack of participation with domestic violence counseling, the parenting visitation program, and parent-child evaluation, as well as his frequent incarcerations, continued to escalate throughout August and September 2015.

The respondent was incarcerated again at the beginning of August 2015 and missed additional visits. The respondent and Ms. McCaffrey met on October 6, 2015, after he had missed several appointments, to discuss new referrals. Although respondent told Ms. McCaffrey that he was interested in visits, Ms. McCaffrey informed him that remaining out of jail in order to consistently parent Mandy, as well as having suitable housing, would be new tasks that would be added to his case plan.

It is significant that respondent had not provided his address to DCYF for some time. Consequently, DCYF had not been able to determine the appropriateness of respondent's housing. DCYF made new referrals to the Boys Town visitation program for respondent and to Dr. John Parsons for a parent-child evaluation, and changed his visitation schedule with Mandy to accommodate his work hours, even though respondent did not provide employment information to DCYF.

The respondent was arrested again on November 4, 2015, and the record reflects that he was sentenced to a term of 90 days at the Adult Correctional Institutions. Visits resumed after his release in February 2016. Ms. McCaffrey testified that, on February 12, 2016, she engaged in a phone call with respondent and informed him that DCYF was filing a petition for termination of parental rights and that, as a result, no new referrals for services would be made. She also informed him that the case was being assigned to another caseworker.

That worker was Mr. Rojas, who resumed responsibility for respondent's case in February 2016. He testified that he supervised bi-weekly visitation between respondent and Mandy. He also testified that, although respondent attended visits and brought snacks for Mandy, he did not provide diapers, formula, or other clothing she might need. Mr. Rojas testified that Mandy had been in the same foster home since two days after her birth. He observed that Mandy did not resist visits with respondent, but that she was quiet and somber and separated easily from him and,

by contrast, was joyful when returned to her foster home. He described a close, loving bond between Mandy and her foster parents and the other family members in the foster home. He testified that the foster parents were willing to adopt Mandy should she be freed for adoption.

The respondent testified on his own behalf. He said that the only reason that Mandy was in DCYF custody was the actions of Mandy's mother. He claimed that he complied with DCYF's planning and he "did domestic" and his "own anger management." He testified that he was no longer with Mandy's mother, and that he was stable and "doing much better without the mother." He testified that he had enrolled Mandy in day care and that she was at the top of the waiting list to enter. He said that she would have her own room in his apartment and could take karate and piano lessons. He also testified that he had two sons who had lived with him for the first seven years of their lives.

On June 27, 2017, the trial justice rendered a bench decision, terminating respondent's parental rights to Mandy. He acknowledged respondent's testimony during trial "that he was a changed man" who "had done things on his own that have prepared him now to receive the child[,]" but noted that respondent had not presented any witnesses to that effect. He stated that respondent's case was a complicated and difficult case and that respondent had "taken on a difficult challenge in representing himself[,]" but that the court did require that he "take upon himself stand-by counsel

so that he would have someone to turn to, regarding issues concerning procedural events happening during the course of this trial." He found that respondent had "failed to complete his case plans" and had "failed to really look at the case plans, insisting that they were not necessary." He also found that respondent had failed to complete services such as a substance abuse program, a parent-child evaluation, domestic violence and visitation programs, and that he had presented no evidence of employment or appropriate parenting skills. The trial justice further found that respondent had rejected DCYF's efforts "to assist him, except for attendance to visitation." He explained that "visitation alone is not sufficient to avoid a petition involving a termination of parental rights[,]" and that what was required was "a continuous and repeated effort to comply with services intending for the child's return."

The trial justice concluded that, based on the evidence, respondent was unfit to parent Mandy, given his "failure to comply with services so as to receive his daughter into his home." He concluded that Mandy had "been placed in the legal custody and care of [DCYF] for at least 12 months[,]" and that respondent had been "offered or received services to correct the situation which led to the child being placed[,]" but that there was "not a substantial probability that the child will be able to be returned safely to the father's care within a reasonable period of time[.]" He

found that respondent was unfit to parent Mandy and concluded that it was in the child's best interests that respondent's parental rights be terminated.

The decree terminating respondent's parental rights was entered on July 27, 2017. The respondent filed an appeal *pro se*, and the matter was subsequently docketed in this Court on November 10, 2017.[6] However, the prebriefing notice was returned as "not deliverable," and a second notice was sent to respondent on January 16, 2018. A conditional order of dismissal was entered against respondent on February 26, 2018, which would have been vacated if his prebriefing statement was filed by March 8, 2018. No prebriefing statement was filed by respondent by that time. This Court then returned the case to the Family Court. The child was adopted on May 15, 2018, by her foster parents, following a hearing in Family Court. However, on September 10, 2018, this Court vacated the dismissal of respondent's appeal after appointed counsel entered on his behalf.

## II

### Standard of Review

"On appeal, this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019) (quoting *In re Amiah P.*, 54 A.3d 446, 451 (R.I. 2012)). "These findings are

---

[6] The respondent did not appeal the finding of neglect.

entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Amiah P.*, 54 A.3d at 451). "Such findings must be supported by clear and convincing evidence." *Id.*

## III

## Discussion

On appeal, respondent presents two issues for our review. First, he asserts that the decree terminating his parental rights to Mandy should be vacated because he had been denied the effective assistance of counsel in that he did not waive his right to counsel and because the trial justice did not inquire whether he wished for or qualified for appointed counsel. Second, he maintains that the trial justice was clearly wrong to conclude that there was parental unfitness and that there was no substantial probability that Mandy could be placed in respondent's care within a reasonable period of time.

## A

## Ineffective Assistance of Counsel

"[A] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is * * * a commanding one." *In re Bryce T.*, 764 A.2d 718, 721 (R.I. 2001) (quoting *Lassiter v. Department of Social Services of Durham County, North Carolina*, 452 U.S. 18, 27 (1981)). While "in some circumstances

due process might require appointment of counsel in a termination of parental rights proceeding, * * * the Constitution does not require appointment of counsel in every such case." *Id.* (quoting *Lassiter*, 452 U.S. at 31). However, despite the lack of a constitutional directive, Rule 18(c) of the Rhode Island Rules for Juvenile Proceedings provided at all relevant times in this case that "[a] preliminary hearing shall be held on [a petition for involuntary termination of parental rights] for the court to * * * (4) Appoint an attorney to represent the parent(s) and any person having such care or custody of such child when said parent(s) or custodian [is] unable to afford such representation[.]"[7] As we have said, "[t]he rule, however, neither expressly provides to a parent the right to substitute counsel in the event the parent has discharged appointed counsel, nor does it preclude substitute counsel." *In re Bryce T.*, 764 A.2d at 721. Therefore, "there is no mandate to appoint substitute counsel after a respondent has discharged an appointed counsel." *Id.*

In this case, respondent did not unilaterally discharge his counsel, but instead he and his counsel agreed that they did not see eye to eye about counsel's representation of respondent. Counsel filed a motion to withdraw, to which respondent did not object. Also, respondent did not request the appointment of new counsel, but rather he acquiesced to proceeding *pro se*. The trial justice articulated

---

[7] Rule 18 of the Rhode Island Rules for Juvenile Proceedings was amended effective January 6, 2020, and the quoted portion of the rule is now found at Rule 18(b)(4) with minor stylistic revisions.

the risks of proceeding *pro se* to him, and, in doing so, the following exchange took place:

> "THE COURT: * * * Are you telling this Court, once again - - I remember last time I went over with you the fact that this is a big responsibility we're talking about here, and you had talked about wanting to be pro se. Have you had time to think about all that we discussed?
>
> " * * *
>
> "THE COURT: So, you understand that what you're asking to do would be trying this case, basically. And, there are rules of engagement. You know, there is some latitude, but not very much. This case has to stand up to any possible processes that might follow thereafter. They have to meet muster under the rules for litigation. Do you think you have the intelligence and the ability to do that?
>
> "[RESPONDENT]: Well, your Honor --
>
> "THE COURT: You are asking to be pro se. So, I mean, everything that goes with it will end up on your shoulders.
>
> "[RESPONDENT]: That's fine. It can knock me off my feet, but I'm going to take my best shot."

Considering the entire record, it is evident that respondent has failed to allege any basis for a finding that he did not knowingly give up his right to counsel. The record indicates that the trial justice advised respondent that there were serious consequences in his proceeding *pro se* and that respondent understood that his attorney would no longer represent him, and he would be proceeding to trial *pro se* with stand-by counsel. We also note that at no time during the proceedings did

respondent mention a financial need for a court-appointed attorney, and that he had asserted to the court that he was employed.

In addition, after the trial justice granted counsel's motion to withdraw, he appropriately appointed an attorney to act as stand-by counsel to assist respondent during the trial. "We have held that 'there is no mandate to appoint substitute counsel,' once a respondent has discharged appointed counsel[.]" *In re Ginger G.*, 775 A.2d 255, 258 (R.I. 2001) (quoting *In re Bryce T.*, 764 A.2d at 721). "However, we also suggested that 'trial [justices] should direct that an appointed, dismissed attorney serve as stand-by counsel in the event the unrepresented party is unable to proceed *pro se* or requires assistance during trial.'" *Id.* (quoting *In re Bryce T.*, 764 A.2d at 722). It is not lost upon us that respondent's decision to proceed *pro se* occurred on the very cusp of trial and on a day that the trial justice had set aside to reach this case on the merits. It is, therefore, our opinion that the trial justice committed no error in allowing respondent to proceed *pro se*.[8]

---

[8] It is worth noting that Rule 18 of the Rhode Island Rules for Juvenile Proceedings calls for a preliminary hearing on whether counsel should be appointed. Here, the relevant discussions occurred just as trial was to commence.

# B

## Determination of Unfitness

"Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re Violet G.*, 212 A.3d at 166 (quoting *In re Amiah P.*, 54 A.3d at 451). Given the drastic and irreversible nature of a termination of parental rights decree, "the right to due process requires that the state support its allegations by clear and convincing evidence." *Id.* (quoting *In re Amiah P.*, 54 A.3d at 451).

"Before terminating a parent's rights to his or her child, the Family Court justice must find that the parent is unfit." *In re Violet G.*, 212 A.3d at 166 (brackets omitted) (quoting *In re Amiah P.*, 54 A.3d at 451). "In these cases, the right to due process requires that the state support its allegations by clear and convincing evidence." *Id.* (quoting *In re Amiah P.*, 54 A.3d at 451). "However, once the Family Court justice determines parental unfitness, the best interests of the child outweigh all other considerations." *Id.* (brackets omitted) (quoting *In re Amiah P.*, 54 A.3d at 451).

In the case now before us, the trial justice found that there was sufficient evidence to support a conclusion that respondent was unfit as a parent and that DCYF had made reasonable efforts to reunify respondent and his daughter. He also found that respondent had neglected or failed to cooperate with DCYF's efforts "to

- 17 -

assist him, except for attendance to visitation." He found by clear and convincing evidence that, based on the evidence, there was "not a substantial probability that the child will be able to be returned safely to the father's care within a reasonable period of time[.]" Although respondent had been "offered or received services to correct the situation which led to the child being placed[,]" the trial justice found that respondent was unfit to parent Mandy, given his "failure to comply with services so as to receive his daughter into his home."

We agree and discern no error in the trial justice's determination that DCYF granted respondent many opportunities and services to enable him to reunite with his daughter, and that respondent did not take advantage of those services.

After a determination of parental unfitness has been made, and after a showing of reasonable efforts at reunification, the Court's analysis "shifts to the overarching issue of the best interests of the child," which outweigh all other considerations. *In re Violet G.*, 212 A.3d at 167. A determination of the best interests of the child includes "the right of a minor child to reasonable care and maintenance, freedom from abuse or neglect, and the right to be given an opportunity to spend the remainder of his or her childhood in a family setting in which the child may grow and thrive." *In re Christopher B.*, 823 A.2d 301, 317 (R.I. 2003) (quoting *In re Stephanie*, 456 A.2d 268, 271 (R.I. 1983)).

Here, the trial justice determined that "it is in the best interest of the child that this father's rights be terminated so as to allow the child to be in a permanent, loving, nurturing home." We are mindful of the "significance of severing the bond between parent and child[.]" *In re Violet G.*, 212 A.3d at 168 (quoting *In re Alexis L.*, 972 A.2d 159, 170 (R.I. 2009)). Nonetheless, we are satisfied that the trial justice appropriately determined that the termination of respondent's parental rights was in the best interests of the child. *See In re Alexis L.*, 972 A.2d at 170 (explaining that "[a]lthough this Court is ever cognizant of the significance of severing the bond between parent and child, it is in the best interests of children to have a safe and nurturing environment in which to live, learn[,] and grow").

## IV

## Conclusion

For the reasons set forth in this opinion, the decree of the Family Court is affirmed. The record in this case may be returned to the Family Court.



STATE OF RHODE ISLAND

SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Mandy M. |
| **Case Number** | No. 2017-380-Appeal. (10-1397-4) |
| **Date Opinion Filed** | October 29, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Rossie L. Harris, Jr. |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Laurel C. Ferrelli, Esq.<br>Court Appointed Special Advocate<br><br>Benjamin Copple, Esq.<br>Department of Children Youth and Families |
| | For Respondent:<br><br>Kara Hoopis Manosh, Esq. |