June 19, 2019

**Supreme Court**

No. 2018-24-Appeal.
(15-803-1)

In re Violet G.                    :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at (401) 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Violet G.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  The respondent, Jennifer L. (respondent), appeals from a decree entered in the Family Court that terminated her parental rights with respect to her daughter, Violet G., who was born on December 24, 2013.  This case came before the Supreme Court on March 28, 2019, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided.  After reviewing the parties' memoranda and considering their oral arguments, we are satisfied that cause has not been shown, and we proceed to decide the appeal at this time without further briefing or argument.  For the reasons set forth in this opinion, we affirm the decree of the Family Court.

### Facts and Travel

On October 5, 2016, the Department of Children, Youth, and Families (DCYF) filed a petition[1] in the Family Court seeking to involuntarily terminate the parental rights of respondent.  A neglect petition seeking commitment of Violet to the care, custody, and control of DCYF also was pending. In the termination petition, DCYF alleged that Violet had been placed in DCYF's custody or care for at least twelve months; that respondent was "offered or received services to

---

[1] The petition also named Violet's father; however, he subsequently agreed to a direct consent adoption of Violet to her foster mother on January 27, 2017.

correct the situation which led to the child being placed"; and that there was "not a substantial probability that the child [would] be able to return safely to [respondent's] care within a reasonable period of time considering the child's age and the need for a permanent home." *See* G.L. 1956 § 15-7-7(a)(3). After the respondent declined to voluntarily relinquish her parental rights and consent to Violet's adoption, the case proceeded to trial, which was held before a Family Court justice over eight trial days between February 14 and July 25, 2017. For reasons that are not clear in the record, the neglect petition was consolidated with the termination petition by agreement of the parties. In light of respondent's chronic mental illness and her love for her child, we recount the trial testimony in detail.

John Parsons, Ph.D. (Dr. Parsons), an expert in the field of clinical psychology, testified that respondent was referred to him by DCYF for a psychological evaluation because respondent's "mental health and capacity to care for her daughter" was in question. The DCYF provided Dr. Parsons with records outlining its concerns for Violet's care and custody, along with several of respondent's medical records. These records disclosed that respondent had a "significant amount of mental health history" and had been hospitalized for: (1) psychiatric reasons between fifteen and twenty times; (2) multiple suicide attempts; (3) a question of substance abuse; and (4) multiple episodes of domestic violence involving Violet's father, both as victim and perpetrator.

Doctor Parsons testified that he completed an evaluation of respondent after four separate meetings between August 3, 2015, and November 13, 2015, and also conducted one parent-child evaluation session with respondent and Violet present. He testified that, on one occasion, respondent came into her appointment "with a bathing suit top on and shorts[,]" was "somewhat disheveled[,]" and "appeared to be in a manic state." He described her history as: "Just a very,

- 2 -

very sad case of someone, you know, that it wasn't her fault. She just basically has chronic mental health issues that interfered with all aspects of her life." Throughout respondent's evaluation, Dr. Parsons testified, her "mood was unstable" and her speech was "pressured and loud[,]" even though she tried, unsuccessfully, to speak in a more "moderated fashion[.]"

During the parent-child evaluation meeting, Violet was reluctant to separate from her foster parents, who stayed with her for the entire session. Violet would not make eye contact with respondent and whimpered throughout the session. Although respondent made attempts at conversation with her daughter, Dr. Parsons testified, Violet refused to speak with respondent; Dr. Parsons noted that there was "limited evidence of a positive bond." Thereafter, respondent "became overwhelmed and was crying, and she tried to hug Violet, who pushed her away at the end of the session."

Doctor Parsons diagnosed respondent with "bipolar disorder with psychotic features[,]" but no cognitive impairment. With respect to the goal of reunification, Dr. Parsons recommended that respondent have "active involvement with mental health, substance abuse treatment with random supervised toxicology screens," and that respondent "be given six months to resolve or make improvement as far as the areas that we talked about, and if not, the Court should terminate her rights."

Joshua Cottle (Cottle), a child protective investigator with DCYF, testified that he became involved in Violet's case on April 29, 2015, after a telephone call received by the child abuse hotline reporting that respondent had taken too much of a prescribed medication. According to Cottle, he went to respondent's mother's home, where he encountered respondent, her parents, and Violet, who presented "no outward signs of child maltreatment." The respondent told Cottle that she had taken two sleeping pills because Violet's father had been arrested for

domestic violence. On May 1, 2015, DCYF learned that Violet's father was back in the home and that he had been arrested for violating a no-contact order—Violet was not present during her father's subsequent arrest. Cottle also testified that, in a prior domestic-violence incident between the couple, respondent engaged in an act of domestic violence against Violet's father.

Carl Desjarlais (Desjarlais), a caseworker with DCYF, testified that he was first assigned to Violet's case in July 2015. In total, Desjarlais prepared four case plans for respondent; he testified that reunification with Violet was the primary goal for each case plan. During their first meeting, respondent discussed her mental-health status and informed Desjarlais that she had a history of hospitalizations. The respondent disclosed that she had a medical marijuana card for headaches; however, Desjarlais testified that she was advised not to use marijuana by counselors at Community Care Alliance, a mental-health facility respondent was attending before Desjarlais' assignment to Violet's case. He also testified that respondent told him that she had attempted suicide on more than one occasion.

Initially, while Violet was in foster care, Desjarlais testified, respondent's supervised visits with Violet were held weekly at the Woonsocket DCYF office. However, the visits were "difficult" and Violet, who was "very apprehensive to visit[,]" took at least twenty minutes to warm up to respondent each time. In November 2015, respondent was referred to Northern Rhode Island Visitation (NRIV) for visitation. Unfortunately, respondent's visits with Violet through NRIV lasted for only "two to three weeks" because respondent "didn't think the visitation program had her best interest in mind," and she accused NRIV of conspiring with DCYF to remove Violet. Based upon NRIV's discharge recommendation, respondent's visits were changed from weekly to biweekly, and Desjarlais supervised those visits.

In February 2016, respondent was referred to the Families Together visitation program at the Providence Children's Museum, which offers support in regard to parenting and visitation. Desjarlais informed respondent that, as the goal of reunification became more viable, and if the visits progressed successfully, visits would become less restrictive, more frequent, and for a longer duration. After eighteen consecutive weekly visits, respondent was discharged from the program; the discharge report concluded that respondent struggled with visitation, and recommended a permanency plan other than reunification with Violet and that the visits again be reduced to biweekly.

Desjarlais also spoke about respondent's issues with domestic violence, which were reported to him in the fall of 2015, including an incident where respondent punched her mother in the nose, another time when respondent cut the cords to her mother's electrical appliances, and another time when respondent bit her mother on the wrist and breasts and would not allow her mother to leave the room. As a result, respondent was referred to Blackstone Valley Advocacy Center, where she attended "twelve or sixteen" group counseling sessions for domestic violence.

The four case plans prepared by Desjarlais were introduced into evidence. He summarized the goals of each plan, which included mental-health counseling, medication compliance, arriving on time for visitation with a snack or game, and following the recommendation of the providers, as well as completing probation requirements, including domestic-violence counseling. He testified that, although respondent had been consistent with her visits and was currently compliant with services, he did not recommend reunification with Violet. He testified that he based his recommendation on respondent's "history of mental health concerns,* * * her inconsistency of maintaining proper medications," her "sometimes aggressive

- 5 -

and assaultive behavior when she is off medication[,]" and his concern that, when she sleeps all day, she would not be able to supervise Violet.

Amanda Grandchamp (Grandchamp), a family clinician in the Families Together program at the Providence Children's Museum, testified that respondent attended thirteen out of fifteen scheduled visits between June 9, 2016, and October 5, 2016. She described respondent as having inconsistent moods, including depression and anxiety. Grandchamp testified that, at one meeting, respondent became "volatile and was verbally aggressive," she "stood up and was shouting at points, upset at things that had been discussed during the meetings[,]" and accused the social worker of wanting to adopt Violet. Grandchamp testified that she recommended that visitation needed to be fully supervised and monitored, and should be biweekly because of her "concerns about the relationship with Violet and Violet's apprehensiveness and [respondent's] mental health and lack of improvement with behavior changes." Grandchamp recommended that an alternate permanency plan be developed.

The Family Court justice reserved decision on the termination of parental rights petition pending an opportunity for Dr. Parsons to review the documents submitted into evidence and for the parties to recall him for further testimony. However, she found by clear and convincing evidence that respondent had neglected Violet, and directed that visitation be reduced to biweekly supervised sessions. Subsequently, Dr. Parsons again testified and stated that he had seen respondent for re-evaluation on three occasions—two sessions with respondent and the third session with respondent and Violet. During the third session, Dr. Parsons testified, Violet "was tearful; would not make eye contact with anyone[,]" and was in such visible distress that he stopped the session after approximately twenty-five minutes. The respondent also exhibited hostility toward Violet's foster mother and Dr. Parsons, and was crying and screaming in the

- 6 -

waiting room. His expert opinion was clear and definite: reunification between respondent and Violet was a significant risk. He added that, although respondent appeared to be taking her prescribed medication and had not had any recent hospitalizations, she had not engaged in mental-health therapy in months and had not disclosed that information. He noted that "there is no doubt that [respondent] truly loves this little girl, but my sense is with her own limited insight into her mental illness, that she doesn't have the protective capacity[.]" Doctor Parsons stated that, in his opinion, there were no other services that DCYF could offer to respondent to aid in reunification.

The respondent testified last and provided the court with a selection of photos, which pictured Violet with respondent, respondent's mother, and Violet's father. The respondent testified to her observation of one photo in particular as, "[Violet] has a smile on her face. She is very happy to be with me." Among other things, respondent stated that "Mr. Desjarlais was cold, calculated and just as cold and calculated as his cohort, * * * Dr. Parsons, as well as Amanda Grandchamp, who I found emotionally banal and just non-engaging." The respondent testified that she was of the opinion that she had "participated in everything on the service plan required of [her]."

On August 30, 2017, the Family Court justice issued a comprehensive written decision, spanning fifty-two pages, concluding that termination of respondent's parental rights was in the best interest of Violet. The trial justice conducted an in-depth review of all the testimony, as well as relevant portions of the trial exhibits, and made seventy-three separate findings of fact. She found, by clear and convincing evidence, that respondent was unfit because she was unable to complete the objectives of her case plans, which DCYF had carefully tailored in an effort to address the specific issues in this case. The Family Court justice then went on to find, by clear

- 7 -

and convincing evidence, that "DCYF developed four case plans and made reasonable efforts to assist [respondent] with parenting and reunification with Violet to no avail due to [respondent's] noncompliance with DCYF and service providers which renders her unfit to parent Violet now or in the foreseeable future." Despite the efforts of DCYF and numerous service providers, the court found, "visitation with [respondent] and Violet has been very traumatic for Violet, there is no maternal bond between Violet and [respondent] despite two years of efforts[.]" The Family Court justice concluded that "there is not a substantial probability that [Violet] will be able to return safely to [respondent's] care within a reasonable period of time considering [Violet's] age * * * and [her] need for a permanent home." Accordingly, the Family Court justice held that termination of respondent's parental rights was in the best interest of the child.

A decree terminating respondent's parental rights to Violet entered on September 6, 2017, and a timely notice of appeal was filed on September 18, 2017.

### Standard of Review

"On appeal, 'this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence.'" *In re Amiah P.*, 54 A.3d 446, 451 (R.I. 2012) (brackets omitted) (quoting *In re Victoria L.*, 950 A.2d 1168, 1174 (R.I. 2008)). "These findings are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence." *Id.* (quoting *In re Victoria L.*, 950 A.2d at 1174). Such findings must be supported by clear and convincing evidence. *See id.*

"Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *Id.* (quoting *In re Destiny D.*, 922 A.2d 168, 172 (R.I. 2007)). "Before terminating a parent's rights to his or her child, the [Family Court] justice must find that

the parent is unfit." *Id.* "In these cases, the right to due process requires that the state support its allegations by clear and convincing evidence." *Id.* "However, once the [Family Court] justice determines parental unfitness, 'the best interests of the child outweigh all other considerations.'" *Id.* (quoting *In re Jazlyn P.*, 31 A.3d 1273, 1279 (R.I. 2011)).

## Analysis

Before this Court, respondent assigns error to the Family Court justice's finding of unfitness; her conclusion that DCYF made reasonable efforts to provide services to address the circumstances that led to Violet's placement in the first instance; and her determination that the termination of respondent's parental rights was in the best interest of Violet. After carefully reviewing the Family Court record and the arguments of the parties, we conclude that legally competent evidence exists to support the findings of the Family Court justice.

## Parental Fitness

A parent is deemed unfit when the parent has "exhibited behavior or conduct that is seriously detrimental to the child, for a duration as to render it improbable for the parent to care for the child for an extended period of time[.]" *See* § 15-7-7(a)(2)(vii). A finding of parental unfitness under § 15-7-7(a)(2) made by a trial justice is "entitled to great weight and will not be disturbed on appeal unless [it is] clearly wrong or the trial justice misconceived or overlooked material evidence." *In re Jennifer R.*, 667 A.2d 535, 536 (R.I. 1995).

In finding respondent unfit, the Family Court justice's determination rested on respondent's stark failure to follow through with the treatment services provided to her and her inability to reach stability in terms of her mental health, behavior that led to Violet's placement in the care and custody of DCYF for over two years. Specifically, the Family Court justice found, by clear and convincing evidence, that respondent failed to address her parenting and

- 9 -

substance-abuse issues, as well as her very real need for mental-health treatment and medication management. The court found that reunification would be high risk and not in Violet's best interests because respondent's lack of cooperation with DCYF services and failure to comply with DCYF case plans rendered her unfit to parent Violet. Accordingly, despite respondent's contention that the record is devoid of sufficient evidence of parental unfitness, our review of the record convinces us that legally competent evidence exists to support the Family Court justice's findings as to parental unfitness.

**Reasonable Efforts**

In order for the Family Court to terminate a respondent's parental rights in accordance with § 15-7-7(a)(2)(vii), it is incumbent upon DCYF to establish, by clear and convincing evidence, that it made "reasonable efforts" to "encourage and strengthen the parental relationship[.]" Section 15-7-7(b)(1). In addition, § 15-7-7(a)(3) mandates that DCYF establish by clear and convincing evidence that it offered "services that amount to a reasonable effort to correct the situation that led to the [child's] removal" from the parent's care. *In re Lauren B.*, 78 A.3d 752, 760 (R.I. 2013). Under no circumstance have we enlarged these requirements to a point where DCYF need demonstrate that it took "extraordinary efforts[.]" *Id.* (quoting *In re Jose Luis R.H.*, 968 A.2d 875, 882 (R.I. 2009)). Rather, the law requires that DCYF employ "reasonable efforts," and the reasonableness of such efforts "must be determined from the 'particular facts and circumstances of each case.'" *In re Joseph S.*, 788 A.2d 475, 478 (R.I. 2002) (quoting *In re Kristen B.*, 558 A.2d 200, 203 (R.I. 1989)).

After reviewing the record, we are of the opinion that the Family Court justice correctly concluded that DCYF complied with its statutory obligation to make reasonable efforts to reunify respondent with Violet. Indeed, she found that DCYF "made extraordinary efforts" to

strengthen and encourage the parental relationship between respondent and Violet for more than two years, including four case plans, numerous suitable arrangements for visitation, and referrals to various family services to assist with parenting, substance abuse, domestic violence, mental-health counseling, and management of medication. *See In re Jose Luis R.H.*, 968 A.2d at 882. The respondent was unwilling to or simply incapable of complying with these reasonable efforts; she refused to acknowledge a serious mental-health issue that impacts her ability to care for Violet. The Family Court justice concluded that, "[a]lthough she may attend parenting classes and counseling, [respondent] is unable or unwilling to follow the guidance, advice and counseling given to her about parenting Violet, and therefore not able to ensure the child's safety and wellbeing." Accordingly, we perceive no basis for disturbing the finding of the trial justice that DCYF made reasonable efforts at reunification, and we hold that, on this record, there was clear and convincing evidence of the same.

### The Best Interests of the Child

Once DCYF has demonstrated parental unfitness and has shown that it made reasonable efforts at reunification, the analysis then shifts to the overarching issue of the best interests of the child, a determination that outweighs all others. *In re Kristina L.*, 520 A.2d 574, 580 (R.I. 1987). In the case at bar, the Family Court justice concluded that "[Violet] has been in DCYF care continuously since her removal in July of 2015, and that it is in her best interest that she be adopted by her foster family due to [respondent's] inability to care for her now or in the foreseeable future." The Family Court justice made several findings in support of her conclusion. She noted that "Violet becomes very upset during visits with her mother [and, although] the mother clearly loves Violet, it is evident that [respondent's] mental health issues and 'erratic behavior,' which this court has observed on numerous occasions throughout the trial,

- 11 -

is upsetting to Violet." In addition, the trial justice detailed respondent's behavior in front of Violet and others: "[Respondent] gets anxious and cannot control her emotions"; "respondent can escalate and becomes angry"; and "Dr. Parsons observed [respondent] shouting at Violet and questioning her about the visits." The Family Court justice concluded that "Violet is only 3 years old and her mother appears to be very scary to her."

Although we remain mindful of the "significance of severing the bond between parent and child," we are satisfied that the evidence presented in this case supported the termination of the respondent's parental rights. *In re Alexis L.*, 972 A.2d 159, 170 (R.I. 2009) ("[T]his Court is ever cognizant of the significance of severing the bond between parent and child[; however,] it is in the best interests of children to have a safe and nurturing environment in which to live, learn and grow."). Accordingly, after careful review of the record, we are satisfied that the Family Court justice's findings are not clearly wrong and that she did not overlook or misconceive material evidence. We therefore refuse to disturb the Family Court justice's conclusion that termination of respondent's parental rights was in the best interest of Violet.

## Conclusion

For the reasons stated herein, we affirm the decree of the Family Court terminating the respondent's parental rights with respect to her daughter, Violet. The papers may be remanded to the Family Court.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re Violet G. |
| **Case Number** | No. 2018-24-Appeal. (15-803-1) |
| **Date Opinion Filed** | June 19, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice Laureen D'Ambra |
| **Attorney(s) on Appeal** | For Petitioner: Karen A. Clark Department of Children, Youth & Families |
| | For Respondent: Cynthia E. MacCausland, Esq. |