June 23, 2025

**Supreme Court**

| | | |
|---|---|---|
| In re J.R. | : | No. 2023-57-Appeal. |
| | | No. 2023-61-Appeal. |
| | | (P 17-2806) |
| | | |
| In re E.R. | : | No. 2023-58-Appeal. |
| | | No. 2023-62-Appeal. |
| | | (P 17-2807) |
| | | |
| In re A.R. | : | No. 2023-59-Appeal. |
| | | No. 2023-63-Appeal. |
| | | (P 17-2809) |
| | | |
| In re D.R. | : | No. 2023-60-Appeal. |
| | | No. 2023-64-Appeal. |
| | | (P 17-2812) |

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | | |
|---|---|---|
| In re J.R. | : | No. 2023-57-Appeal. |
| | | No. 2023-61-Appeal. |
| | | (P 17-2806) |
| | | |
| In re E.R. | : | No. 2023-58-Appeal. |
| | | No. 2023-62-Appeal. |
| | | (P 17-2807) |
| | | |
| In re A.R. | : | No. 2023-59-Appeal. |
| | | No. 2023-63-Appeal. |
| | | (P 17-2809) |
| | | |
| In re D.R. | : | No. 2023-60-Appeal. |
| | | No. 2023-64-Appeal. |
| | | (P 17-2812) |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** The respondents, K.M. and E.R., Sr.,[1]

appeal from decrees of the Family Court, terminating their parental rights to their

four eldest children, J.R., E.R., A.R., and D.R. The respondents raise several issues

on appeal, arguing that the trial justice erred in terminating their parental rights and

in admitting the report of the guardian *ad litem* assigned to represent the interests of

---

[1] The Court will refer to the respondents by their first and last initials to protect the identities of the children. No disrespect is intended. Additionally, we use the designation "E.R., Sr." simply to differentiate the respondent father from his son, E.R.

the children in this case. For the reasons set forth herein, we affirm the decrees of the Family Court.

**I**

**Facts and Travel**

This case arises from a termination of parental rights (TPR) action, in which the trial justice terminated the parental rights of respondents to their four eldest children. The following facts are derived from the voluminous trial court transcripts and record.

The respondents are married and now have six children. On March 1, 2016, their fourth child's meconium tested positive for cocaine at birth, which prompted a call to the Department of Children, Youth, and Families (DCYF) hotline. As a result, all four children then living at respondents' home were removed on March 8, 2016. They have never returned. At the time of removal, respondent mother conceded that she had used cocaine during the pregnancy with her fourth child, and at trial, she stated that she knew she was pregnant at the time. Neglect petitions were filed as to all four children.

In April 2016, DCYF held the first in a series of case-planning meetings with respondents. Around that time, DCYF began making service plan referrals for respondents for various programs and providers. Both respondents were referred to the Providence Center for mental health counseling and an eight-week program

through Children's Friend, called Project Connect; respondents were also referred to Key Program's Triple P (Positive Parenting Program). Courthouse drug screening was eventually ordered for both respondents. Additionally, respondents were put on the waitlist for the Boys Town visitation program.[2] In the interim—while respondents were on the Boys Town waitlist—DCYF supervised visitation between respondents and their children.

On October 26, 2016, after reviewing records and evaluations from the Providence Center, Project Connect, Triple P, and the courthouse drug screening program, DCYF created a case plan for respondents. The first case plan that DCYF created focused on parenting, substance abuse, mental health, visitation, and reunification. According to testimony at trial, in December 2016, the Family Court ordered drug screening at the courthouse, noting that visitation between the children and respondents would be increased if respondents complied; they did not. Six months later, in May 2017, DCYF created a second set of case plans, which were nearly identical to the first. Meanwhile, the Boys Town waitlist opened, and respondents were finally able to start visitation programming through Boys Town in

---

[2] Boys Town is a nonprofit organization that offers a family visitation program aimed at reuniting parents with their children. The program helps parents to "learn new skills, build on their parenting strengths, and develop healthy relationships with their children." *Boys Town New England's Family Visitation Program Helps Reunite Parents with Their Kids*, Boys Town New England, (May 14, 2024), https://www.boystown.org/new-england/news/boys-town-new-england-s-family-visitation-program-helps-reunite-parents-with-their-kids.

March 2017.  Reports through Boys Town noted minimal to no progress for many of the stated objectives.  On August 2, 2017, DCYF filed TPR petitions as to all four children based on the minimal behavioral change on the part of both parents since the removal of the children in March 2016.  The petitions alleged that the children had been placed in the custody of DCYF for at least twelve months and that "parents were offered or received services to correct the situation which led to the child[ren] being placed," and that there was "not a substantial probability that the child[ren] will be able to return safely to the parents' care within a reasonable period of time * * *."

In the interim between the filing of the TPR petitions and the case proceeding to trial, two other children were born to respondents.[3]  Both children were initially placed in foster care.  The respondents then engaged in the Safe and Secure Baby Court (SSBC).[4]  Case plans were created for respondents through SSBC, aimed at reunifying respondents with their fifth child; presumably these case plans were later amended to account for the birth of their sixth child.  The respondent father

---

[3] The children were born on August 12, 2018, and May 4, 2020.
[4] The Safe and Secure Baby Court is a program *within* the Rhode Island Family Court system.  The program was established in 2017 and operates as a separate calendar that provides "intensive support and services to parents of newborns up to eighteen months old" and is "dedicated to supporting families facing challenges in providing safe and nurturing environments for their infants." *About Safe and Secure Baby Court (SSBC)*, Rhode Island Family Court, https://rifamilycourttraining.org/ssbc-about/ (last visited June 12, 2025).

completed a psychiatric evaluation at Roger Williams Hospital in October 2018, which concluded that he did not meet the criterion for psychiatric diagnosis or medication. The respondent mother completed an outpatient program at Roger Williams Hospital in April 2018. In light of their compliance with the programs and visitation parameters set out in the case plans with SSBC, respondents were reunified with their two youngest children in October and November of 2020. The cases were closed, and those two children remain in the custody of respondents to this day.

Despite the reunification of respondents with their two youngest children, the TPR case for their four eldest children proceeded to trial. The trial initially began on January 29, 2020. Due to COVID-19 and the passing of the trial justice originally assigned to the case, however, the trial was suspended until May 2021.

The trial spanned several weeks and included the testimony of a dozen witnesses, including both respondents; Nicholas Hemond, the guardian *ad litem* (GAL) assigned to represent the interests of the children; Kelly Rebelo, a social caseworker at DCYF; Odina Slavin, another social caseworker at DCYF; Christine St. George, a social caseworker for DCYF covering for Slavin when she went on medical leave during part of the trial; Derrick Johnson, a child-support technician at DCYF; Megan Dunn, a supervisor in the Child Protective Investigative Unit at DCYF; Anna Robinson, a clinical therapist at the Providence Center; Kristen Andriole, a clinician appointed to assess the father; Cynthia Rodriguez, an officer

for the Providence Police Department; and Jermaine Woods, a firefighter for the Providence Fire Department.

At trial, DCYF presented several witnesses and exhibits discussing and documenting respondents' compliance, or lack thereof, with various programs and guidelines. Recognizing the complicated and difficult circumstances of proceedings of this nature, we note at the onset that both respondents experienced troubled pasts. No doubt respondent mother had a particularly disturbing past. She testified that she was sexually abused by her mother's boyfriend for approximately seven years as a child. According to testimony, the boyfriend then impregnated her, and she carried the child to term. The respondent mother's own mother then took the baby to raise as her own and ousted the respondent mother from her family home. The respondent mother attempted suicide several times (all prior to having these children) and engaged with the Providence Center to receive mental health services. The Providence Center diagnosed her with major depressive disorder, anxiety disorder, obsessive compulsive disorder, post-traumatic stress disorder, and stimulant use disorder, cocaine. The respondent mother reportedly also told one of the DCYF caseworkers that she additionally was diagnosed with anxiety, depression, and bipolar disorder.

The respondent father, too, had a difficult and troubled past. He reported being physically abused by his mother, who he said would beat him repeatedly in

the head.  The respondent father was additionally hospitalized for a week at Butler Hospital in 2014 after having experienced suicidal ideations and mental health issues.  The respondent father furthermore disclosed past substance-use and mental health treatment.  The respondent father testified at trial that he has ten children in total, although he could not remember all their birth dates.

In the years immediately following the removal of their four eldest children, respondents were inconsistent with their drug tests and experienced several positive screens[5] as well as myriad inconsistencies with their referred programming.  The respondent mother did complete an intake at the Providence Center, a psychiatric evaluation in June of 2016, two phases of the Triple P Standard Parenting program in December 2016, the Pathways parenting program, and an anger-management program.  The respondent father completed an intake with the Providence Center in 2016.  He also attended a substance-abuse evaluation as of early 2017, but he tested positive for cocaine and it appears he never returned for his next appointment.  During this time, respondents were working toward having unsupervised visitations until an incident occurred in which one child told a DCYF staff member that respondent mother hit him during a visit.

---

[5] A refusal to attend or a no-show to a drug test is classified and recorded as a positive drug test by DCYF.

Unfortunately, the list of programs that respondents did not successfully complete and the list of rules that respondents did not comply with are substantially longer than those that they did complete and comply with. When respondent mother began attending the Providence Center in 2016, she was still testing positive for cocaine; she then began missing screens. As a result, a justice of the Family Court ordered screens at the Family Court; the respondent mother usually either missed those screens or she tested positive. The respondent mother continued having difficulty completing drug screens, so the social worker suggested switching to at-home screens; the respondent mother still either missed the screens or tested positive. This pattern continued well into 2017.

The respondent mother was inconsistent with the Providence Center programs: She missed appointments, missed drug screening, and missed sessions with counselors and the psychiatrist. According to the testimony at trial, she was inconsistent in taking medication and did not fill her prescriptions from December 2016 to March 2017. She did not complete the program Looking Upwards and was finally discharged from Project Connect for noncompliance in August 2016. She was then referred to Children's Friend Substance Abuse program in 2017 but was discharged for lack of engagement. Ultimately, DCYF recommended residential treatment services in April 2017. She declined but agreed to attend an intensive outpatient program; however, she never followed up after the referral. She was

discharged from an anger-management program at the Providence Center, apparently due to her interaction with the staff. She failed to follow up or appear for her Women's Day Program referral. After several missed appointments with the Providence Center generally from April through May 2017, she was finally discharged from their programming on September 6, 2017, for failing to appear. On or about August 18, 2017, she was notified that she would be terminated from psychiatric services within 30 days.

The respondent father did not complete any court drug screens after May 12, 2016. He then tested positive for cocaine at a Providence Center screen in January 2017; it appears from the record that he never returned that year. He never meaningfully engaged with any programming at the Providence Center and the transcript reveals that, most of the time, he did not show up to appointments for screens at all, often allegedly due to work obligations. He was ordered to submit to random screens on October 19, 2018, tested negative once and then never returned. Additionally, in September 2016, respondent father appears to have overdosed; mother called emergency services, who administered Narcan upon arrival at respondents' home.[6]

---

[6] The parties dispute the cause of the alleged overdose. The respondents claim he ingested legal, synthetic marijuana from a drug store and had a bad reaction, from which he became unresponsive. DCYF and the GAL appeared doubtful that the alleged overdose was due to synthetic marijuana based on the testimony of Jermaine Woods, a firefighter, and Providence Police Officer Cynthia Rodriguez. The

Despite respondents' difficulties with compliance in the years immediately following the removal of their four eldest children, the respondents made great progress while engaged in SSBC. The respondents appear to have been negative on their drug tests since 2018, which marks nearly five years of negative drug screens at the time that this appeal was filed. We also note that respondents completed all the programs and referrals necessary to have been reunified with their two youngest children through SSBC. We note again that those cases were closed and remain closed, indicating the progress that respondents have made with respect to parenting their youngest children. Moreover, by the close of trial, nearly six years after the case opened, the parents had improved their lives significantly. The respondent mother was a manager at Dunkin' Donuts. The family attended church regularly, where they received support and assistance from the church community. The respondents have an apartment that can accommodate all six children, and living arrangements appear to have been clean, safe, and well furnished. The two youngest children attend daycare and are watched by their father when the mother is at work.

Evidence was also presented as to the relationship and visits between respondents and their four eldest children. The respondents represent that, throughout the case, they continued visitation with those children. They speak to

respondent father also takes issue with the trial justice's reliance on information that the father was "charged with possession of a controlled substance and placed on probation" because no such evidence was admitted at trial.

their children on the phone regularly, often helping them with their homework. Testimony clearly demonstrates that the children show love and affection for their parents and express their hopes to see their parents more and perhaps live with them. The DCYF caseworkers noted that the children are bonded with the respondent mother. Moreover, at times, the two oldest children appear to have expressed their wishes to go home to live with their parents. The four eldest children appear, from the transcripts, to be quite bonded with their younger siblings. Additionally, the record demonstrates that the children expressed their wishes to see their parents more often.

At the time of the trial, the subject children were living together in a foster home and had been since 2018. According to the testimony at trial, the children appear to be well-adjusted and report feeling happy and safe in their foster home. The children appear to love their foster parents and are strongly bonded to them and their foster home. Notably, since the children have been together in that foster home since 2018, it is the only home that some of them know or remember. The children have, at times, also expressed that although they want to continue to see their parents, they also want to live with their foster family.

We note, however, that from the children's initial removal from respondents' home until the trial, respondents' visits with their four eldest children never progressed to being unsupervised; nor did respondents ever have overnight visits.

DCYF caseworker Kelly Rebelo expressed concern that the eldest child occasionally would "take on a little bit more of a parental role" during visits, which Ms. Rebelo did not consider to be age-appropriate. Additionally, caseworkers expressed concerns that the visits were chaotic with six children, presented safety concerns, and sometimes required two supervisors per visit. Although DCYF staff noted that the respondent mother was good with the children on visits, they also noted that the father was more engaged with the younger children and required prompting to tend to the older children.

At the close of evidence, the trial justice ordered a neuropsychological evaluation and substance-use assessment for respondent father. Apparently due to some issues with the necessary releases, respondent father did not comply with the order for a neuropsychological evaluation. After completing a new assessment at the Providence Center, respondent father was again inconsistent with attendance. The trial justice also ordered a substance use assessment and mental health evaluation for respondent mother. It appears from the record that respondent mother complied. Furthermore, the trial justice encouraged visitation at the parents' home and increased visitation frequency. And, presumably due to the long history of negative screens, the trial justice discontinued courthouse drug screens unless requested by DCYF.

Posttrial memoranda were filed by the parties, briefing some of the issues that are now on appeal. Thereafter, the trial justice issued a one-hundred-page bench decision on May 31, 2022, in which he terminated parental rights to all four children. A decree entered in each case on November 15, 2022.[7] Timely appeals from both respondents with respect to all four children followed. Those eight appeals were consolidated by order of this Court.

## II

### Standard of Review

"On appeal, this Court reviews termination of parental rights rulings by examining the record to establish whether the Family Court justice's findings are supported by legal and competent evidence." *In re R.M.*, 293 A.3d 1255, 1264 (R.I. 2023) (quoting *In re Violet G.*, 212 A.3d 160, 166 (R.I. 2019)). "Those findings 'are entitled to great weight, and this Court will not disturb them unless they are clearly wrong or the trial justice overlooked or misconceived material evidence.'" *Id.* (quoting *In re Violet G.*, 212 A.3d at 166).

Similarly, "[t]he admissibility of evidence is within the sound discretion of the trial justice." *Estrella v. Janney Montgomery Scott LLC*, 296 A.3d 97, 103 (R.I. 2023) (quoting *Cappuccilli v. Carcieri*, 174 A.3d 722, 729 (R.I. 2017)). "This Court

---

[7] An amended decree entered in each case on October 17, 2023.

will not interfere with the trial justice's [evidentiary] decision unless a clear abuse of that discretion is apparent." *Id.* (quoting *Cappuccilli*, 174 A.2d at 729).

## III

## Discussion

The respondents raise two distinct issues on appeal. First, respondents argue that the trial justice erred in terminating their parental rights. This argument relies on three separate claims of error: (1) that the trial justice erred in finding respondents were unfit under G.L. 1956 § 15-7-7(a)(3); (2) that the trial justice erred in finding that DCYF made reasonable efforts as required under § 15-7-7(b)(1); and (3) that the trial justice erred in finding that termination of parental rights was in the best interests of the children. Second, respondents argue that the trial justice erred in admitting the GAL report and that doing so unfairly prejudiced them. For these reasons, respondents argue, the termination of parental rights decrees should be vacated.

## Termination of Parental Rights

"Natural parents have a fundamental liberty interest in the care, custody, and management of their children." *In re R.M.*, 293 A.3d at 1263 (quoting *In re Jae'La G.*, 276 A.3d 378, 389 (R.I. 2022)). "That interest does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the state." *Id.* (quoting *In re Jae'La G.*, 276 A.3d at 389). "The fundamental right of

parents, however, is not absolute." *Id.* at 1264 (quoting *In re Jae'La G.*, 276 A.3d at 389).

A termination of parental rights proceeding essentially has three steps, first, the court must find the parents are unfit; after a finding of unfitness, the court must find that DCYF made reasonable efforts at reunification. *See In re Violet G.*, 212 A.3d at 166-67. If both of those steps are satisfied, the court must then analyze the overarching issue of what is in the best interests of the children. *See id.* at 167.

"[G]iven the drastic and irreversible nature of a termination of parental rights decree, the right to due process requires that the state support its allegations by clear and convincing evidence." *In re Lucas D.*, 272 A.3d 109, 118 (R.I. 2022) (quoting *In re Rylee A.*, 233 A.3d 1040, 1051 (R.I. 2020)).

**Unfitness**

We begin by addressing respondents' argument that the trial justice erred in finding that they were unfit under § 15-7-7. Before terminating a respondent's parental rights pursuant to § 15-7-7(a)(3), the trial justice must find by clear and convincing evidence that

> "[t]he child has been placed in the legal custody or care of [DCYF] for at least twelve (12) months, and the parents were offered or received services to correct the situation that led to the child being placed; provided, that there is not a substantial probability that the child will be able to return safely to the parents' care within a reasonable period of time considering the child's age and the need for a permanent home[.]" Section 15-7-7(a)(3).

- 15 -

Here, the parties do not dispute that the children have been in the custody of DCYF for at least twelve months, and thus we turn to the trial justice's finding that respondents were "unfit" under the meaning of the statute. The respondents present multiple arguments to this point, which we address in turn. First, respondents argue that they raised their first three children for years without the involvement of DCYF and that they were successfully reunified with their two youngest children. This reunification demonstrates, they argue, that they were already deemed to be fit parents. In support, respondents point to the success of their two youngest children and respondents' own success with SSBC.

This Court has previously held that a parent's relationship and fitness regarding one child is not generally applicable to that parent's relationship and fitness regarding *all* their children. *See In re Tinisha P.*, 697 A.2d 622, 625 (R.I. 1997) (indicating that the mother's progress as to one child did not override other evidence that compelled a finding of unfitness to parent the subject children); s*ee generally In re Eric K.*, 756 A.2d 769, 772-73 (R.I. 2000) (stating that the mother's current enrollment in programming as to some of her children did not preclude a finding of unfitness to parent the other subject children).

The trial justice found that the two children reunified with respondents under SSBC were in "far different circumstances than the four [children] that are before the [c]ourt." He found that their differences in age, time of care with DCYF, and

- 16 -

difference in need for a permanent home all supported that the circumstances were not the same as to all of respondents' children. Especially given the timeline related to removal and reunification, the trial justice found that respondents' relationship and familial bond was different with their two youngest children. Moreover, the trial justice explained that "a parent's lack of interest with his or her child evidenced by an unwillingness to cooperate with DCYF services can be a basis for a finding of unfitness." Additionally, the trial justice noted that he had continuing concerns regarding the protective capacity of respondents as it related to their four eldest children "due to the hectic and chaotic" nature of the visits. The respondents still needed to be assisted by two staff people during visits in which all six children were present. Additionally, he noted that respondents had never progressed to overnight visits, or even unsupervised visits, with their four eldest children. This, he reasoned, supported his finding that, although respondents may have been deemed to be fit as to their two youngest children, they are not fit as to *all* their children.

We recognize, as respondents point out, that chaos at visits with six children is perhaps inevitable, and, we recognize that, in large families, elder children often assist with younger children. Despite this, there is substantial evidence on the record to support the trial justice's findings that respondents were not fit to parent all six of their children. Given the weight afforded to the trial justice's findings, we cannot say that this determination was erroneous.

The respondents argue that the trial justice did not give enough consideration to respondents' progress since reunification with their youngest children. The respondents point to the fact that they had "appropriately managed their substance abuse and mental health issues for years" at the time of trial, had safe and secure living arrangements, stable employment, and had tested negative in drug screens for nearly three years at the time the trial began (nearly five years by the date of termination). Essentially, at oral argument, respondents argued that fitness should be deemed as of the time of trial and not based on the early years of this case. Relatedly, respondents also argue in their papers to this Court that the trial justice erred in considering the alleged overdose and drug-related offenses by respondent father when determining parental fitness.

"This Court has stated that 'refusal to cooperate with the objectives of the case plans constitutes clear and convincing evidence of a lack of interest in the child and, as such, could properly serve as a basis for a finding of parental unfitness.'" *In re R.M.*, 293 A.3d at 1265 (quoting *In re Elana W.*, 249 A.3d 287, 294 (R.I. 2021)). When considering the cooperation of the parents, we have previously affirmed the termination of parental rights when the trial justice found that the parent(s) "refused to meaningfully engage with DCYF and most of the services offered to [them], particularly those related to mental health [and] suspected substance abuse * * *." *Id.* Furthermore, this Court has upheld numerous termination decisions despite

evidence of sobriety and compliance on the part of the parents as of the time of trial. *See, e.g.*, *In re Maya C.*, 764 A.2d 116, 118-19 (R.I. 2001); *In re Eric K.*, 756 A.2d at 771-73; *In re Jovanny R.*, 725 A.2d 891, 892 (R.I. 1998) (mem.); *In re Marcella*, 834 A.2d 717, 719 (R.I. 2003).

The trial justice found that respondents failed to make any progress on their service plans until long after the TPR petitions were filed and did not make any significant progress until after the birth and subsequent removal of their sixth child. He found that respondents did not attend important clinical sessions, achieve or maintain sobriety, or take advantage of the services offered to them through DCYF. Although the trial justice recognized that respondents were successfully reunited with their two youngest children through SSBC, he also recognized that reunification took place long after the removal of their eldest children. At that point, over five years had passed; this, he found, meant that the four eldest children had not been and could not have been returned to respondents in the "reasonable period of time" contemplated by the statute, especially considering the children's age and need for a permanent home.

A determination of parental fitness is not predicated solely on the circumstances at the time of trial; rather, the trial justice may consider the entirety of the record and the overall history of respondents. *See In re Marcella*, 834 A.2d at 719-20 (holding that sobriety and progress at the time of trial is not necessarily

- 19 -

sufficient to overcome the history of respondent). Given the wealth of information on the record related to respondents' noncompliance and long histories of substance abuse, we cannot say that this finding was not supported by clear and convincing evidence or that the trial justice overlooked or misconceived evidence in making his determination.

Our review of the record, rather, leads us to the definite conclusion that the trial justice's findings in this regard are supported by competent evidence. At the time the trial justice issued his decision on May 31, 2022, the four eldest children had been in foster placement for over six years. It was not until the birth of respondents' sixth child in May 2020, when respondents participated in the SSBC, that they demonstrated meaningful compliance with the DCYF service plans. Thus, for the first four years of their children's placement in foster care, respondents showed only minimal progress toward reunification. Even as of today, they have yet to have unsupervised, much less overnight, visitation. We agree with the trial justice's conclusion that there is not a substantial probability that the four eldest children can be safely returned to respondents' care within a reasonable period of time.

We briefly address respondents' contention that the trial justice erred in considering the drug-related incidents of respondent father. Based on the trial justice's review of the record, he found that respondent father had suffered an

overdose in 2016. Given the broad discretion accorded to the trial justice in evidentiary matters, we cannot say that this was error. To respondents' other point, upon a review of the record, respondents are correct that evidence of the respondent father's drug-related offense was not admitted into evidence and, thus, should not have been relied upon by the trial justice when issuing his decision. We note, however, that the trial justice's mention of this alleged offense totaled no more than a few lines in the transcript of a one-hundred-page bench decision. The trial justice did not state that he had relied on the incident in his analysis or that it affected his analysis. As such, we deem any mention of it to have been harmless error.

**Reasonable Efforts by DCYF**

The respondents additionally argue that the trial justice erred in finding that DCYF made reasonable efforts as required under the statute. After a finding of unfitness, but before terminating a respondent's parental rights in accordance with § 15-7-7(a)(3), DCYF must establish "by clear and convincing evidence that it offered services that amount to a reasonable effort to correct the situation that led to the children's removal from the parent's care." *In re Jae'La G.*, 276 A.3d at 391 (brackets omitted) (quoting *In re Gelvin B.*, 251 A.3d 503, 510 (R.I. 2021)).

The respondents argue that, because their two youngest children were reunified as a result of the SSBC program, had DCYF truly made "reasonable efforts" like those made via the SSBC program, the other four children would also

have been reunified. Instead, respondents claim that "DCYF had tunnel vision when it came to substance use and mental health services" and did not appropriately diversify their referrals. To this point, respondents argue that DCYF should have ordered more evaluations, including a neuropsychological evaluation and parent-child evaluation. Additionally, respondents submit that DCYF unreasonably delayed in creating the case plans and essential services such as visitation programming for the respondents. Relatedly, they contend, DCYF gave the parents too little time to work on their case plans, noting that substance abuse is usually tied to periods of relapse.

This Court has previously explained that, when considering DCYF's efforts, DCYF need not "'demonstrate that it took extraordinary efforts'; rather, DCYF must 'employ reasonable efforts, and the reasonableness of such efforts must be determined from the particular facts and circumstances of each case.'" *In re Jae'La G.*, 276 A.3d at 391 (quoting *In re Gelvin B.*, 251 A.3d at 510). Whether DCYF's efforts were reasonable should be analyzed subjectively, "taking into account, among other things, the conduct and cooperation of the parents." *Id.* (quoting *In re Jose Luis R.H.*, 968 A.2d 875, 882 (R.I. 2009)).

The trial justice found that respondents were offered many services to remedy the issues they faced; he also found, however, that respondents were not responsive to those services. Indeed, respondents either declined services or agreed to them

only to be discharged for noncompliance. The trial justice found that "[t]here must be a demonstrated showing of an effort on the part of the parent." A failure of respondents to meaningfully engage in any of the services offered to them, he found, does not mean that the court should "lay blame at the agency's feet * * *."

As a preliminary matter, we note that the SSBC was not in existence at the time respondents' case opened and that, at the time that the SSBC came into existence a year later, three of the four children were no longer eligible for the program. As such, we find respondents' argument that DCYF did not make reasonable efforts because DCYF did not refer to SSBC to be without merit.

As DCYF points out, it is clear from the record that the caseworker assigned to respondents began referrals for services within the first month of the opening of the case, regardless of when the actual service plans were officially drafted.[8] As DCYF additionally noted and as was testified to at trial, visitation also began through DCYF early in the case while respondents waited for an opening at the Boys Town program. We agree with the trial justice that DCYF made reasonable efforts to offer services to respondents to remedy the issues leading to the removal but that respondents, for at least four years, were simply "not receptive to these services."

---

[8] Throughout the trial, the term "case plans" was usually used. In its brief, however, DCYF points out that they were actually "service plans" and not "case plans" and, thus, were not subject to the same drafting time parameters.

**Best Interests of the Children**

The respondents additionally argue that the trial justice erred in finding that termination of parental rights was in the best interests of the children. "Once DCYF has demonstrated parental unfitness and has shown that it made reasonable efforts at reunification, the analysis then shifts to the overarching issue of the best interests of the child, a determination that outweighs all others." *In re Violet G.*, 212 A.3d at 167.

The respondents argue that the trial justice overlooked the effects that the termination of parental rights would have on the relationship between the four eldest children and their two younger siblings, who remain with respondents. Furthermore, respondents aver that, if the foster mother hypothetically decided not to adopt the children, the children would be subject to foster care. Lastly, respondents contend that the trial justice should not so strongly have considered the fact that the parents have never progressed to unsupervised visits or the chaotic nature of the visits as observed by the social workers when determining the best interests of the children.

This Court has recognized that "[s]evering the bond between the parent and child is a substantial disruption." *In re R.M.*, 293 A.3d at 1267. But we also recognize that "it is in the best interests of children to have a safe and nurturing environment in which to live, learn and grow." *In re Alexis L.*, 972 A.2d 159, 170

(R.I. 2009).  When determining the best interests of the child, the trial justice is permitted to consider relationships and bonds that have formed in a foster home. *Id.*

The trial justice found that the four eldest children had spent most of their lives in their foster home.  He found that the children were bonded to their foster parents and were happy in their foster home.  In support, the trial justice noted the emotional and physical affection that the children were reported to have for their foster parents, that they called them "mama" and "papa," and that the foster parents expressed their desire to adopt the children.  The trial justice found that it would risk the children's emotional well-being to uproot them from the only home they knew, as "the children are settled into a new family life."

The trial justice also expressed concerns about the "protective capacity" of both respondents.  He lamented that "[d]uring the entirety of this case, the [respondents] never progressed beyond supervised visits with the children.  They never enjoyed a single overnight with the children. They never cared for the children for an extended period."  Given the great weight afforded to a trial justice in making such determinations, we cannot say that the trial justice overlooked or misconceived material evidence as to this point.  As such, we deem no error in his finding that the termination of parental rights was in the best interests of the children.

## Admission of the GAL Report

Finally, we address respondents' argument that the trial justice erred in admitting the GAL report. The respondents claim that admitting the report was error because it was rife with both hearsay and double hearsay, being an out-of-court statement and containing the out-of-court statements of the foster mother and the children. Admitting this report, respondents argue, unfairly prejudiced respondents because "there is no question that the trial justice factored [the GAL report] into his decision * * *."

Rule 19 of the Rhode Island Rules for Juvenile Proceedings, which explains the role of a GAL, applies to termination of parental-rights cases. Most relevant here, Rule 19(d) provides that a "guardian ad litem shall have the right to participate in all proceedings and may initiate and respond to motions." Additionally, Rule 19(h) also says that "the guardian ad litem shall have the right to * * * [p]resent evidence" and "[c]ross-examine witnesses." This enables the GAL to participate in the proceedings as an advocate, presenting evidence and examining and cross-examining witnesses. Furthermore, the rule provides that the GAL "shall have the right to * * * [m]ake recommendations to the court[,] * * * [s]ubmit written reports to the court, * * * [and] [i]nvestigate and ensure that the best interests of the child are served." R. Juv. P. 19(h). As such, we perceive no error in the GAL participating in the trial or in preparing a report at the order of the Family Court.

Those rules and our Rules of Evidence, however, are silent as to the *admissibility* of a guardian *ad litem*'s report once prepared. We are of the opinion that the admissibility of such reports is nevertheless subject to the Rules of Evidence.[9] The respondents argue on appeal that the guardian's report was rank hearsay and thus inadmissible. "Hearsay evidence is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." *State v. Lynch*, 854 A.2d 1022, 1030 (R.I. 2004) (quoting *State v. Angell*, 122 R.I. 160, 167, 405 A.2d 10, 14 (1979)). Under the Rules of Evidence, unless a statement falls within an exception, statements deemed to be hearsay are not admissible at trial. *See id.* Here, the report contained not just the report and recommendations of the GAL but also statements of the children and foster parents made to the GAL. It is clear to us that the statements were introduced for the truth of the matter asserted. Thus, the report and its contents were clearly hearsay under the definition of the rule and should not have been admitted absent an exception, for which we find none in the record.

---

[9] Termination of parental rights proceedings differ substantially from civil domestic custody cases, something that respondents themselves noted at trial. In the latter, the order appointing the guardian *ad litem* often specifically enumerates that the GAL report will be automatically admitted into evidence subject to cross-examination of the GAL. Due to the life-altering and permanent nature of the outcome of a TPR proceeding, we do not deem TPR proceedings to be akin to civil domestic custody cases; nor do we believe the rules and practices should be transferrable between the two instances.

Despite our agreement with respondents that the GAL report was, in fact, hearsay and should not have been admitted into the record, Rule 19 of the Rules for Juvenile Proceedings clearly intends for the report to be prepared by the GAL and considered by the Family Court, even if it is not admitted into evidence. The GAL is charged with acting in the best interests of the children whom he or she is appointed to represent; it follows naturally, then, that at least considering the opinion of the GAL is a necessary part of reviewing the GAL report.

To place the issue before us in context, we review the pertinent circumstances surrounding the admission of the guardian's report into evidence. The trial justice was questioning respondent father by asking whether he agreed with certain statements that the trial justice quoted from the guardian's report. Counsel objected, stating, "I'm concerned about the statements from the guardian's report being read into evidence, in that the report itself is not in evidence." The respondent father's counsel elaborated, "it contains a lot of hearsay," and "I wouldn't propose that the [c]ourt cannot read the report, but I would propose that the [c]ourt cannot take it as evidence as a full exhibit." The trial justice then queried whether he could "review anything if [it is] not in evidence as a full exhibit." He proceeded to resolve the conundrum by having the guardian take the witness stand, to which respondent father objected on the grounds that the guardian was not on the witness list and had been "intimately involved with the negotiations * * *." Counsel for respondent

- 28 -

mother also objected, raising Rule 3.7 of Article V of the Rules of Professional Conduct, which prohibits a lawyer from acting "as an advocate at a trial in which the lawyer is likely to be a necessary witness" except in certain enumerated circumstances.

After a short recess, the guardian was called to testify by DCYF. The guardian testified, without objection, that he had met with all four children on two occasions and with the foster mother at her home. He also attempted to contact both respondents through counsel but had not spoken with them personally. His testimony focused on the two eldest children, who he felt were "capable of offering input on [their] situation * * *." The guardian recounted what E.R. told him about living in his foster home and whether he wanted to stay there and whether he wanted to see his parents more. The only objection posed was to a leading question, which was sustained.

After DCYF concluded its direct examination, the parties engaged in a lengthy colloquy concerning the admissibility of the guardian's report. The trial justice observed that the guardian essentially "wears two hats * * *." He was appointed by the chief judge of the Family Court and directed to prepare a report and, additionally, "he represents the children[.]" The trial justice noted, however, that principles of due process would allow respondents to cross-examine the guardian. The counsel for respondent father stated he would have no objection to the admission of the report

if it was limited to what the guardian had just testified to, i.e., what the children had told him.

The trial justice acknowledged that the guardian could testify without the report ever being introduced into evidence. He revealed, however, that he had read the report before the trial commenced. Indeed, he stated, "I don't know how to unring that bell, except to give you an opportunity to cross-examine. Honestly, I don't know the answer to that." The trial justice also noted that there is "a rule that says guardian reports are full exhibits" in domestic cases, but not in the context of termination cases.

In the case before us, the guardian was in fact subject to cross-examination. He testified that he was aware that respondents had successfully completed their case plans with respect to, and indeed had been reunited with, their two youngest children. He indicated that he was aware that respondent mother had maintained sobriety for a long period of time, was employed full time, and was "bond[ed]" with her four eldest children. The guardian also revealed that he had reviewed "well over 1,000 pages" of discovery.

During cross-examination by counsel for respondent father, the guardian stated that the foster mother had mentioned to him "in passing" that "she was looking to move to Florida." He also said, "I never indicated in my report anything other

than that these children love their parents and that they want to maintain contact with their parents. I believe I indicated that they want to see their parents more."

After reviewing the evidence introduced at trial, the trial justice concluded that "[t]he [c]ourt finds by clear and convincing evidence that the [r]espondents are unfit because they were unable to complete the objectives of their case plans." Based upon our review of his decision, we are satisfied that his conclusion in this regard is well supported by the testimonies of DCYF social case workers, a Providence Center clinician, and respondents, as well as reports from treatment providers, most notably the Providence Center.

To be sure, the trial justice referenced the guardian's report in his decision, noting several observations made by the guardian concerning respondents, of which he (the guardian) did not have firsthand knowledge. It is clear to us, however, that the trial justice did not rely on those observations in making his findings. Rather, he relied principally on the guardian's conclusion that "the children have settled into a new family life" and the guardian's recommendation that it would be in the children's best interests to grant the termination petition. We are satisfied that the admission of the full guardian's report, although in error, was harmless.

# IV

## Conclusion

Termination of parental rights cases are among the most difficult cases an appellate court is called upon to review. Severing the parent/child relationship has life-altering consequences for the child and often devastating consequences for the parent. Yet for all the emotional turmoil these cases may engender, we are cognizant and respectful of the very difficult role that the trial justice assumes.

We are guided therefore by our standard of review and examination of the record to determine whether the trial justice's findings are supported by legal and competent evidence. If so, such findings are entitled to great weight.

Here, the trial justice presided over a trial lasting nearly six weeks. He then issued a very thoughtful and comprehensive decision. We are well-satisfied that his factual findings and legal conclusions are predicated upon legal and competent evidence. We have no cause to disturb them.

This case is especially heart-wrenching given the progress respondents have ultimately made in addressing the substance-use and mental health issues that initially caused the removal of their children. Their achievements, as reflected in their abilities to parent their two youngest children, are commendable. It cannot be denied, however, that their initial lack of compliance with treatment plans and their

numerous missed or positive drug screens significantly contributed to their inability to reunify with their four eldest children within a reasonable period of time.

It is our expectation that, by affirming the decrees of the Family Court, the issue of permanency will be resolved for these children. It is our hope, however, that they will be able to continue a relationship with the respondents. The guardian *ad litem* describes all four children as being very bright and remarkably well-adjusted. It is also clear from the record that they are bonded with their biological parents and enjoy their visits, albeit "loosely" supervised. The fact that the respondents' parental rights are being terminated does not necessarily require that they be foreclosed from the children's lives.

For the foregoing reasons, we affirm the decrees of the Family Court. The record may be returned to the Family Court.

**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | In re J.R., In re E.R., In re A.R., In re D.R. |
| **Case Number** | No. 2023-57-Appeal.    (P 17-2806)<br>No. 2023-61-Appeal.<br>No. 2023-58-Appeal.    (P 17-2807)<br>No. 2023-62-Appeal.<br>No. 2023-59-Appeal.    (P 17-2809)<br>No. 2023-63-Appeal.<br>No. 2023-60-Appeal.    (P 17 2812)<br>No. 2023-64-Appeal. |
| **Date Opinion Filed** | June 23, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer from Lower Court** | Associate Justice Feidlim E. Gill |
| **Attorney(s) on Appeal** | For Petitioner:<br><br>Nicholas J. Hemond, Guardian Ad Litem<br><br>Benjamin Copple<br>Department of Children, Youth, and Families |
| | For Respondent:<br><br>Kara Hoopis Manosh, Esq.<br><br>Camille A. McKenna, Rhode Island Public Defender |